**ESTATE of Sydney S. BARON, Sylvia S. Baron, Administratrix, and Sylvia S. Baron, Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 623, Docket 85–4072.

United States Court of Appeals, Second Circuit.

Argued Jan. 21, 1986.

Decided Aug. 12, 1986.

---

Marvin E. Frankel, New York City (Steven C. Todrys, Alvin D. Knott, New York City, Kramer, Levin, Nessen, Kamin & Frankel, of counsel), for petitioners-appellants.

Glenn L. Archer, Jr., Asst. Atty. Gen., Washington, D.C. (Michael L. Paup, Ann Belanger Durney, Michael J. Roach, Attys., Tax Div., U.S. Dept. of Justice, Washington, D.C., of counsel), for respondent-appellee.

Leon C. Baker, White Plains, as amicus curiae.

Before LUMBARD, MESKILL and PIERCE, Circuit Judges.

PIERCE, Circuit Judge:

This is an appeal from a judgment of the United States Tax Court, Tannenwald, *Judge,* holding that taxpayers Sydney S. Baron ("Baron"), now deceased, and his wife improperly claimed certain deductions on their joint personal income tax return for the tax years 1977 and 1978 and must therefore pay $230,031 and $82,525 for those years, respectively, pursuant to a notice of deficiency issued by the Commissioner of Internal Revenue ("Commissioner"). The claimed deductions reflected alleged losses relating to certain rights in a master recording of the soundtrack to a movie. Baron had purchased those rights in 1977 for $90,000 in cash and $560,000 in two nonrecourse notes bearing face amounts of $460,000 and $100,000, respectively, and payable solely out of the record sale proceeds. The master recording having generated only slight revenues, the Barons claimed depreciation deductions in 1977 and 1978 based upon the $90,000 cash outlay and the $460,000 nonrecourse note. The Tax Court denied the deductions and held that: (1) the obligation represented by the nonrecourse note was "too contingent" to be included in basis under Internal Revenue Code ("I.R.C.") § 167, 26 U.S.C. § 167, irrespective of the existence of some market value of the master recording rights; and (2) petitioners did not sustain their burden of proving the requisite profit objective under I.R.C. § 183, 26 U.S.C. § 183. *Estate of Baron v. Commissioner,* 83 T.C. 542 (1984).

Appellants argue principally that the Tax Court erred: (1) in excluding the $460,000 note from Baron's deductible basis in the rights without specifically making a finding as to the value of the rights at the time of purchase; and (2) in finding that Baron's purchase of the recording rights constituted an activity "not engaged in for profit" under I.R.C. § 183.

Appellee argues principally that: (1) the Tax Court's exclusion of the $460,000 nonrecourse note from Baron's deductible basis in the rights was proper because the Court found that the fair market value of the master recording securing the note was not reasonably equivalent to the face amount of the note; and (2) the Tax Court correctly found that Baron's purchase of the rights was not an activity "engaged in for profit" under section 183, and that his deductions were thus limited at most to the gross income derived from that activity.

For the reasons stated below, we affirm the judgment of the Tax Court.

## BACKGROUND

Baron was a public relations executive whose gross income was approximately $515,000 for the tax year 1977 and $345,000 for the tax year 1978. In the spring of 1977, Richard Baron, Sydney Baron's son (and a tax lawyer), called Richard Talmadge, an entertainment lawyer to whom he had been referred, and asked whether Talmadge knew of any good entertainment properties in which Richard Baron's family might invest.

Talmadge contacted his friend, Richard Trugman, who was vice-chairman, secretary and treasurer of Casablanca Record and Filmworks, Inc. ("Casablanca"), which was then a young, successful and aggressive film company. Although Trugman at first responded that Casablanca had nothing to sell, he later informed Talmadge that Casablanca would be willing to sell the United States and Canadian rights in the master recording of the soundtrack to "The Deep," a movie that Casablanca was then producing with Columbia Pictures, Inc., based on a novel by Peter Benchley and perceived as a sequel to the movie, *Jaws.* The recording was of fine technical quality and included compositions by John Barry, a well-known composer. Side One of the recording contained Parts I and II of a song entitled "Return to the Sea." On Side Two were two vocal versions—one fast and one slow—of "Theme From the Deep (Deep, Deep Inside)," sung by Donna Summer, a well-known vocalist. Side Two also featured a third version, this one instrumental, of the same song, and a song called "Disco Calypso" by a little known group named "Beckett." In January, 1977, Neil Bogart, Casablanca's president, estimated to Trugman in a memorandum that he believed that Casablanca would sell not less than 100,000 long playing ("LP") record albums, "with a potential of 500,000." Judge Tannenwald found that "the major purpose of the album was to promote the movie." 83 T.C. at 546.

Talmadge informed Richard Baron of the recording. Neither Richard Baron nor his father had had any business experience in the record industry. Judge Tannenwald found, and appellants do not contest, that Baron failed to adduce evidence that he had obtained an appraisal of the value of the United States and Canadian rights in the recording prior to purchasing it in May 1977. Nonetheless, Baron purchased the rights in a three-step transaction.

First, on May 18, 1977, Casablanca sold the rights to "Whittier," a shell corporation wholly owned by Martin Engels, a commercial lawyer with whom Richard Baron shared office space. Whittier in return gave to Casablanca $90,000 in cash and a nonrecourse note in the face amount of $460,000 due in seven years at 7% per annum payable out of fifty percent of the royalties from the master recording. All parties understood that Baron would immediately purchase the rights from Whittier. Second, on May 28, 1977, Whittier sold the rights to Baron for $90,000 cash, the assumption of Whittier's obligation to Casablanca on the $460,000 note, and the issuance from Baron to Whittier of a separate $100,000 nonrecourse note, at 6% annual interest, to be paid out of ten percent of Baron's royalties from the recording. In fact, Engels never received any payments under the $100,000 note, notwithstanding Baron's realization of $32,672 in total royalty receipts in 1977, 1978 and 1979. Moreover, Engels agreed to cancel the $100,000 note on March 1, 1978 when it became clear that record sales were and would continue to be hopelessly low. In the third part of the transaction, Baron sold to Casablanca on May 27, 1977 the sole distribution rights to the master recording. In return, Baron would receive $.80 for each LP album or tape sold in the United States, $.04 for each 45 rpm record sold in the United States, $.40 for each LP or tape sold in Canada, and $.02 for each 45 rpm record sold in Canada. Half of Baron's royalties, however, would be retained by Casablanca as payment on the $460,000 note.

Although Casablanca vigorously promoted the recording, and thereby the film, which itself was a success, record sales

were dismally low. Under the terms of the agreements, it would appear from the Commissioner's analysis of the evidence adduced at trial that approximately 1,150,000 records would have to have been sold for Baron to pay off the $460,000 note and recoup his cash outlay.[1] Instead, Baron's total royalty receipts for three years, net of withholdings by Casablanca pursuant to the distribution agreement, was $32,672. Baron declared $550,000 as his basis in the recording and, under the income forecast method of depreciation, deducted 72.98 percent of that amount ($401,390) on his 1977 joint tax return and the other 27.02 percent ($148,610) on his 1978 joint tax return. The Commissioner issued a notice of tax deficiency for those years, which was the subject of an unsuccessful petition by the Barons before the Tax Court. This appeal followed.

## DISCUSSION

This case requires us to consider whether the Tax Court properly disallowed Baron's depreciation deductions based on the face amount of the $460,000 nonrecourse note and the $90,000 cash outlay in the purchase of a recording that, by all accounts, was a financial failure.[2] The case thus entails analysis of two discrete legal questions arising from a common set of facts attendant to the three-step transaction by which Baron acquired the rights to the recording. These issues are (1) whether, under I.R.C. § 167, the Tax Court properly excluded the $460,000 note from Baron's basis in the recording as "too contingent" an investment, given the uncertain value of the underlying collateral and (2) whether, under I.R.C. § 183, the Tax Court properly concluded that the purchase of the recording did not constitute an activity "engaged in for profit."

1. *Exclusion of the $460,000 Nonrecourse Note.*

■ It is well settled that nonrecourse debt may constitute part of a taxpayer's basis in property under I.R.C. § 167[3] as long as the fair market value of the property securing the debt reasonably approximates the principal amount of the debt. *See, e.g., Brannen v. Commissioner,* 722 F.2d 695, 701 (11th Cir.1984); *Estate of Franklin v. Commissioner,* 544 F.2d 1045, 1048–49 (9th Cir.1976). Conversely, a taxpayer may not include in his basis a liability that, for any economic reason, does not constitute a "genuine debt[]," *Deegan v. Commissioner,* 787 F.2d 825, 827 (2d Cir. 1986) (per curiam), since it would be manifestly unfair to permit a taxpayer to enjoy the benefits of deducting as losses an alleged indebtedness for which there had been no economic incentive or expectation

---

1. Since Casablanca was entitled to retain one-half of $.80, or $.40, per LP sold, it would require sales in the United States of 1,150,000 LPs just to pay off the principal on the $460,000 note. Appellee Br. at 12. An even greater number of records would have to be sold to the extent that revenues reflected sales of LPs in Canada or of 45 rpm singles in the United States or Canada, as to which Baron's royalties were considerably lower.

2. We need not consider any separate tax implications of the $100,000 note to Whittier since Baron did not seek depreciation for the face amount of this note, which apparently purported to serve as consideration for Whittier's preconceived turnaround sale to Baron and which, in any event, was never enforced by Whittier and was cancelled prior to the filing of Baron's 1977 joint income tax return. We note, however, that the existence, nonenforcement and early cancellation of the $100,000 note, construed in light of the fact that all parties to the Casablanca-Whittier transaction understood that Baron would be the ultimate purchaser of the rights, further support the view that the three transactions on May 18, 27 and 28, 1977 were part of an integrated transaction by which Baron acquired certain rights that he nominally purchased for $650,000 and depreciated for tax purposes at $550,000, but which he did not necessarily similarly value as a matter of economic substance.

3. I.R.C. section 167(g), 26 U.S.C. § 167(g), provides that the basis for depreciation is "the adjusted basis provided in section 1011 for the purpose of determining the gain on the sale or other disposition of the property." Section 1011, 26 U.S.C. § 1011, provides that the "adjusted basis" is the "cost" of the property as defined under section 1012. Section 1012, 26 U.S.C. § 1012, includes in cost the amount of liabilities "assumed or taken subject to" by the purchaser. *See Crane v. Commissioner,* 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947).

of repayment. Such cases typically arise either because the face amount of the alleged indebtedness unreasonably exceeds the fair market value of the underlying collateral, *see, e.g., Deegan,* 787 F.2d 825; *Brannen,* 722 F.2d 695, or because the value of the underlying collateral, when considered in light of all relevant circumstances, was so uncertain or elusive that the purported indebtedness must be considered too contingent to justify the depreciation or deduction of the indebtedness from basis. *See, e.g., Fox v. Commissioner,* 80 T.C. 972, 1018–23 (1983) (note payable solely out of book sale proceeds), *aff'd mem.,* 742 F.2d 1441 (2d Cir.), and *aff'd sub nom. Barnard v. Commissioner,* 731 F.2d 230 (4th Cir.), and *aff'd mem. sub nom. Hook v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner,* 734 F.2d 5–9 (3d Cir. 1984).

Baron argues that the Tax Court erred in applying the contingency principle to the present case rather than expressly finding the reasonable value of the rights at the time Baron purchased them so as to determine whether the face amount of the $460,000 note reasonably approximated the fair market value of the rights purchased. We disagree. In our view, Baron's argument misapprehends the nature of the contingency principle and the rationale of the Tax Court's opinion.

The Tax Court's reasoned conclusion that the nonrecourse debt was "too contingent" an obligation to be depreciable is itself a finding that reflects proper consideration of the essential valuation issue. We read the Tax Court as using "contingent" in the sense used by the Fifth Circuit in *Gibson Products Co. v. United States,* 637 F.2d 1041, 1046–49 (5th Cir.1981). The term was used herein to mean that Baron's actual indebtedness arose only if the recording succeeded financially, and Baron thus bore no risk on the note to the extent that such success would not occur. The invocation of the contingency principle by definition means that the taxpayer has failed to sustain his burden of proving that the face value of the depreciated nonrecourse debt reasonably approximated the fair market value of the underlying collateral. Here, the Tax Court was confronted with conflicting evidence regarding the sales revenue that the master recording, an inherently risky investment, could reasonably have been expected to generate at the time of the Baron purchase. Casablanca's own estimate five months before the purchase forecast not less than 100,000 and a "potential" of 500,000 LPs, a range with which the estimate by the Commissioner's expert was consistent. The 500,000 "potential" might have rendered the recording a "gold" record, a distinction in the industry that Casablanca had achieved on nine of its twenty records by 1977.[4] Such an achievement, however, would have been especially notable for this soundtrack given that the star vocalist, Donna Summer, had only limited involvement, which, in any event, was duplicated on a 45 rpm single, and given that the movie had not yet been released and thus the movie's popularity—assuming it would help market the recording—was still an unknown quantity. *See* 83 T.C. at 550–51. Further, the achievement of "gold" status of the recording would have marked only the second time that John Barry composed or conducted the music for a movie soundtrack recording that went "gold." Finally, although Casablanca could be expected to vigorously promote the record, such promotion might, as in fact occurred, inure much more to the success of the film than to that of the soundtrack recording. Indeed, the distribution agreement required Casablanca initially to manufacture and distribute only a modest minimum of 50,000 LPs and 10,000 45 rpm singles.

On the other side, around the time of the transaction, Baron retained two industry experts to appraise the value of the master recording. Irwin Rawitz, then vice-president of Dynamo Records, noted in an un-

---

**4.** Three of Casablanca's records went "platinum," having sold 1,000,000 copies and generated profits earning that distinction. *See* 83 T.C. at 545 & n. 12.

dated letter that some soundtrack recordings sold well over 500,000 LPs and even more 45 rpm singles, and that recent Donna Summer recordings had sold over 600,000 "units" each, and opined that the fair market value of the master recording was over $650,000. In a letter dated May 24, 1977—one week after the execution of the first part of the three-step transaction—MCA Records Vice-President George Lee provided Baron with a similar letter appraisal. Further, Baron introduced at trial expert testimony that estimated a reasonable sales forecast at the time of purchase as 1 to 1.5 million records, though this figure was not reduced to LP and 45 rpm components.

Having considered this conflicting evidence, the Tax Court further noted the ephemeral and sometimes unpredictable nature of recording revenues, as evidenced, for example, by the comment of Bruce Bird, Casablanca's vice-president for promotion, that the soundtrack to "The Deep" simply "wasn't in the grooves." 83 T.C. at 547 n. 18. Given the vastly conflicting evidence, the unpredictability of the particular investment, and the finding that Baron had not proved the requisite likelihood that the recording would meet with popular acceptance and thus generate revenues that would substantiate the depreciated value of the note, the Tax Court held that the recording was not susceptible of valuation, and instead characterized the nonrecourse debt as "too contingent." 83 T.C. at 548–53.

■ Exclusion from basis of nonrecourse debt absent a specific finding on valuation should be permitted only in "rare and extraordinary cases." *See* Rev.Rul. 58–402, 1958–2 C.B. 15, 16; *see also Chamberlin v. Commissioner*, 32 T.C. 1098, 1106–08 (1959), *aff'd*, 286 F.2d 850, 852–53 (7th Cir. 1960) (patent licenses susceptible of valuation), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961); *Grill v. United States*, 303 F.2d 922 (Ct.Cl.1962) (movie rights susceptible of valuation); *O'Brien v. Commissioner*, 25 T.C. 376 (1955) (same); *Herbert v. Riddell*, 103 F.Supp. 369 (S.D.

Cal.1952) (same). Nonrecourse debt may be excluded from basis under the contingency principle when fair market valuation is not reasonably determinable. *See, e.g., Brountas v. Commissioner*, 73 T.C. 491 (1979) (note contingent on discovery of recoverable oil or gas), *vacated and remanded on other grounds*, 692 F.2d 152 (1st Cir.1982), *cert. denied*, 462 U.S. 1106, 103 S.Ct. 2453, 77 L.Ed.2d 1333 (1983); *Fox*, 80 T.C. 972 (note dependent on book sales).

■ Here, the value of the rights at the time of purchase was largely a function of public acceptance of both the movie and the soundtrack, neither of which had yet been released. These variables, in turn, depended on business and aesthetic issues with which Baron had no prior experience and no demonstrated independent assessment prior to the purchase. Baron having failed to sustain his burden of proof as to valuation, the Tax Court could conclude either specifically that the value of the rights purchased were significantly less than the sum of the cash outlay plus the face value of the purported indebtedness, or generally that, whatever the value, Baron's assumed nonrecourse indebtedness was too contingent to warrant depreciation. We cannot say that the Tax Court erred in invoking the contingency principle in this case, where the evidence suggested a broad possible range of values; the underlying collateral was inherently risky, particularly since neither the movie nor the soundtrack had yet been released; and the taxpayer assumed an indebtedness incommensurate with his co-venturer's most optimistic projection, which projection the taxpayer, despite his inexperience, did not endeavor to contravene through pre-purchase appraisals.

Even if, *arguendo*, Baron is correct that the evidence *permitted* the Tax Court to make a specific finding as to valuation, in our view Baron misapprehends the significance of the Tax Court's invocation of the contingency principle for the question of the value of the rights, on which issue Baron in any event bore the burden of proof. In response to Casablanca's own

estimate five months prior to the transaction that the sales potential for the recording was between 100,000 and "a potential of 500,000" LPs, and the fact that the distribution agreement obligated Casablanca to manufacture and distribute only 50,000 albums and 10,000 45 rpm singles, Baron introduced two independent appraisal letters, neither of which was shown to reflect his valuation prior to the initiation of the three-step transactions. At trial, he also presented expert testimony to the effect that the record sales estimate of the producer, Casablanca, was too low. It is noteworthy that Casablanca was in economic substance a co-venturer with Baron in the recording, with an investment stake in the sale of records. *Cf. Sheid v. Commissioner*, 50 T.C.M. (CCH) 663, 672 (1985) (noting co-venturer's valuation). The Tax Court gave Baron's appraisal letters and expert testimony little weight in light of the cogent evidence to the contrary. We agree, particularly given that the letters afforded only brief and sketchy treatment of the value of the rights purchased, with little analysis of relevant technical, industry and marketing data. *Cf. Franklin*, 544 F.2d at 1048 n. 4 (noting that Tax Court considered one appraisal letter inadequate, and adding that a second letter was "of little relevancy" to the value at the time of purchase).

Moreover, as the Commissioner has shown based on the evidence adduced at trial, even assuming Casablanca's projected "potential" sales were reached, that number was still less than half the number of sales that was required to enable Baron to pay off the principal alone on the $460,000 note. *Cf. Odend'hal v. Commissioner*, 748 F.2d 908, 912–13 (4th Cir.1984) (depreciation disallowed where evidence suggested collateral worth less than half purchase price including nonrecourse note), *cert. denied*, —— U.S. ——, 105 S.Ct. 3552, 86 L.Ed.2d 706 (1985). The inevitable conclusion is that, whatever the fair market value of the rights at the time of purchase, Baron failed to sustain his burden of proof that such value reasonably approximated or exceeded his claimed depreciation deductions.

Thus, Baron's intimation that the Tax Court ignored the fundamental issue of fair value, simply because it declined to make a specific finding as to value, rings hollow.

Finally, given that Baron failed to demonstrate that he had obtained an appropriate appraisal of the value of the recording *prior to* purchasing it, Baron's introduction of expert testimony appears as an attempt to rationalize *post hoc* an investment that he likely made on grounds other than valuation. *See* 83 T.C. at 555–57, 560. Baron thus finds himself in the weak position of complaining that the Tax Court failed to do what he himself failed to do before initiating the three-step transaction and at the trial—namely, to ascertain as a businessman entering a transaction and to demonstrate as a petitioner in Tax Court that the fair market value of the rights purchased reasonably approximated the amount of nonrecourse debt claimed as basis. Since it was Baron's burden to demonstrate that the purchase price reasonably approximated the fair market value and since he had a fair opportunity to do so, we need not remand for further proceedings. *Franklin*, 544 F.2d at 1048 n. 4.

2. *Exclusion of Deductions Under I.R.C. Section 183.*

■ We must also consider whether the Tax Court properly concluded that the purchase of the rights was an activity "not engaged in for profit" and thus disallowed Baron's claimed depreciation deductions on not only the nonrecourse note but also the $90,000 cash outlay. Under I.R.C. section 183, if an activity is "not engaged in for profit, no deduction attributable to such activity shall be allowable," 26 U.S.C. § 183(a), except to the possible extent of "gross income derived from such activity," *id.* § 183(b)(2). *See Brannen*, 722 F.2d at 705–06. Baron argues that Congress intended section 183 to apply only where a loss results from "not a business but merely a hobby." H.R.Rep. No. 413, 91st Cong., 1st Sess. 71 (1969). This position is undermined by both other passages from the legislative history of section 183, *see,*

*e.g.*, S.Rep. No. 552, 91st Cong., 1st Sess. 102–03, *reprinted in* 1969 U.S.Code Cong. & Ad.News 2027, 2133 ("the focus is to be on whether the activity is engaged in for profit"); *id.* at 103, 1969 U.S.Code Cong. & Ad.News at 2134 (applying test to inventor and oil well investor), and well-settled case law, *see, e.g., Brannen,* 722 F.2d at 702–06 (applying section 183 to disallow claimed income tax deductions for losses from a limited partnership investment in a movie).

Section 1.183–2(b) of the Treasury Regulations, 26 C.F.R. § 1.183–2(b), promulgated pursuant to section 183, prescribes a nonexclusive list of factors relevant to the determination of whether an activity is "engaged in for profit." These factors are noted in the Tax Court opinion, 83 T.C. at 554, and therefore need not be restated here. Rather, we need only assess Baron's quantitative and qualitative arguments herein regarding the objective purposes of his investment. Such assessment convinces us that the Tax Court was correct in concluding that the transaction as a whole was "not engaged in for profit," and that Baron therefore may not bifurcate the cash outlay from the debt assumption for tax purposes.

### a. *Quantitative Assessment of Investment Purpose.*

■ Baron argues that his expected economic profit in the investment was $110,000, compared to a $37,500 expected maximum tax benefit.[5] Where a *bona fide* expectation of economic gain exists, the possibility of significant tax benefits will not *per se* preclude the taxpayer from taking deductions for depreciation on the investment. *See, e.g., Fox,* 80 T.C. at 1006–07 ("primary purpose ... to make a profit"); *Hirsch v. Commissioner,* 315 F.2d 731, 736 (9th Cir.1963) ("dominant hope and intent of realizing a profit"); *Estate of Thomas v. Commissioner,* 84 T.C. 412, 437 (1985) ("reasonable potential for profit" independent of tax savings). Here, however, Baron failed to demonstrate any reasonable expectation of profit. We therefore need not comment on the precise extent to which a transaction must be profit-motivated for a taxpayer to be entitled to tax benefits arising from the transaction.

It was Baron's burden to "represent and demonstrate that [he] expect[ed] to receive a profit from the transaction, apart from the value of or benefits obtained from the tax deductions." *Cf.* Rev.Rul.Proc. 75–21, 1975–1 C.B. 715, 716 (advance ruling on leases); *Frank Lyon Co. v. United States,* 435 U.S. 561, 583, 98 S.Ct. 1291, 1303, 55 L.Ed.2d 550 (1978) (tax benefits allowed where transaction shown to possess "economic substance ... compelled or encouraged by business or regulatory realities"). Baron's calculation of estimated economic profits assumes that he reasonably had expected that 500,000 LP albums would be sold in the United States. This assumption lacks an adequate evidentiary predicate

5. Baron derives the $37,500 maximum tax benefit as follows: if no records had been sold, the initial tax savings would have been 50% of the $550,000 depreciable basis, or $275,000. Assuming that the tax savings would have earned 5% simple, tax-exempt interest for six years, or $82,500, the savings would have increased to $357,500. Assuming no prior reduction in the principal amount of the note, Baron would have paid in recapture taxes under 26 U.S.C. § 1245 50% of the $460,000 principal amount of the note, or $230,000. Thus, gross gain in 1985 would have been $127,500. Subtracting Baron's initial $90,000 cash outlay leaves $37,500 in 1985 dollars.

Baron derives the $110,000 maximum economic gain as follows: Baron was entitled to a royalty of $.80 per LP album sold in the United States. Until the note was paid off, Casablanca would retain $.40 per album and he would retain the same. If 500,000 albums were sold in the United States, at $.40 per album Baron would gross $200,000. Subtracting his original $90,000 cash outlay leaves an economic profit of $110,000.

We need not consider Baron's alternative suggestion of a $57,500 maximum tax benefit and a $70,000 maximum economic gain, premised on a similar calculation but including in tax basis the $100,000 note to Whittier. This note, which was never enforced and ultimately cancelled, *see* footnote 2, *supra,* was clearly never really part of the purported consideration for the recording, as Baron himself effectively conceded by not attempting to depreciate the note as part of his basis on his tax returns. The note thus should be excluded from the computation of expected economic and tax benefits.

given the totality of evidence considered by the Tax Court, as discussed *supra*.[6]

Baron offers no justification for this assumption on appeal. Further, even in Casablanca's January 1977 sales projection, 500,000 was the most optimistic estimate, with the range of projection beginning at 100,000 albums; moreover, the 500,000 "potential" projection was not specifically limited to sales in the United States, as to which Baron's royalties were twice the amount of his royalties on album sales in Canada. Indeed, most of the possible outcomes in the range of Casablanca's January forecast would result in a loss to Baron on his $90,000 cash outlay, leaving aside the nonrecourse debt. *Cf. Wildman v. Commissioner*, 78 T.C. 943, 954 (1982) (using cash-on-cash return as measure of profit).[7] Baron has not satisfactorily demonstrated a reasonable expectation of economic profit, and, as the Tax Court found, he had not considered this issue prior to the initiation of the transaction herein. *See Surloff v. Commissioner*, 81 T.C. 210, 237 (1983). He may not now choose without substantiation from the record in the Tax Court a favorable sales projection to rationalize *post hoc* the purported profit potential of his venture.

■ Apart from Baron's failure to demonstrate profit potential, Baron's substantial income during the tax years in question and the potential "substantial tax benefits" appurtenant to the investment, 26 C.F.R. § 1.183–2(b)(8), independently support the Tax Court's conclusion that the investment was not "for profit." Baron argues that his maximum tax benefit was not $365,000, as the Tax Court found,[8] but only $37,500. However, his calculation rests on the rather speculative assumption that, having realized little or no income on record sales during the seven-year term of the nonrecourse note, Casablanca would then foreclose on the underlying rights, thereby supposedly triggering as to Baron a recapture tax, pursuant to 26 U.S.C. § 1245, on accumulated depreciation representing the unpaid balance on the note. Even assuming, *arguendo*, that such foreclosure would trigger the recapture tax,[9] Baron offers no reason to believe that such foreclosure would occur. In the first place, we see no basis for hypothesizing that seven years after the release of the record, the United States and Canadian rights would have suf-

---

6. The Tax Court's hypothetical calculation of the economic effect on Baron of sales of 500,000 albums does not constitute, in our view, a finding that 500,000 albums sold in the United States represented a reasonable sales projection at the time of the purchase. Indeed, the Tax Court expressly disavowed making any such finding. *See* 83 T.C. at 557 & n. 42.

7. Even sales of 225,000 albums in the United States would have generated for Baron net revenues of only $90,000—i.e., recoupment of his cash outlay but not the opportunity cost of his capital. In this regard, it bears noting, as the Tax Court observed, that 225,000 may represent the most rational pre-purchase sales projection since at this level of sales Casablanca's revenues from the transaction would be $180,000, the same amount as if Casablanca had kept the rights and realized a full $.80 per album. If Casablanca expected sales to be greater, the Tax Court reasoned, it probably would not have entered into the transaction. *See* 83 T.C. at 556 n. 37. Indeed, in the January memorandum, Casablanca Vice-President Neil Bogart wrote, "I'd feel comfortable if we can break even, and on 100,000 Lps, we'll come close ... and help the movie." Baron, with no prior experience in

this industry and no independent pre-purchase appraisal, would appear not to have had any grounds for a more optimistic projection.

8. Baron urges, and the Commissioner does not dispute, that the Tax Court erroneously applied a 70% rather than a 50% tax rate to Baron's 1977 and 1978 income. Assuming Baron is correct, we nonetheless reject his argument regarding maximum tax benefits for the reasons stated below.

9. In support of his proposition that a foreclosure by Casablanca would constitute a sale or exchange for purposes of 26 U.S.C. § 1245, Baron cites *Commissioner v. Tufts*, 461 U.S. 300, 103 S.Ct. 1826, 75 L.Ed.2d 863 (1983). In that case, however, the taxpayers voluntarily arranged for an orderly sale of their property. Further, we note that Judge Tannenwald merely speculated in dicta that Baron might eventually have to pay a recapture tax under section 1245, *see* 83 T.C. at 556–57, and expressly disavowed any opinion as to whether, even if Casablanca failed to exercise its right of foreclosure, an abandonment might be deemed to have occurred at the time the right of foreclosure accrued, *see id.* at 556–57 n. 39.

ficient economic value to warrant Casablanca's undergoing the transaction costs associated with a foreclosure. Second, Baron does not mention the possibility, which he no doubt would have considered had Casablanca threatened to foreclose, that he might voluntarily have paid down part of the balance due on the note in exchange for an agreement not to foreclose. Finally, if we are to take seriously the maxim, repeatedly urged upon us by Baron and by the *amicus curiae*, that the controlling factor is *"result, not motive," Gilbert v. Commissioner*, 248 F.2d 399, 405 (2d Cir.1957) (Medina, J.), then it is worth noting that seven years have passed, Baron has defaulted on virtually all the principal and interest payments due on the note, and Casablanca has not sought to foreclose. In short, the possibility of foreclosure, if relevant, seems unduly speculative as of the time of Baron's purchase, as confirmed by subsequent events.

### b. *Qualitative Assessment of Investment Purpose.*

Baron also argues that the commitment of Casablanca in promoting the recording supports its position that the project had economic substance. Certainly Casablanca's vigorous promotion efforts, while arguably geared to promote the movie more than the record, are relevant to whether the project, as essentially a joint venture pursuant to the distribution agreement, had economic substance. *See Siegel v. Commissioner*, 78 T.C. 659, 701 (1982) (noting expenditures by unrelated distributor in holding taxpayer's purchase to be for profit). However, although Casablanca of its own accord vigorously promoted the film, the absence of provisions in the distribution agreement requiring such promotion and the modest number of records required to be manufactured and distributed initially under that agreement support the view that, from *Baron's* perspective, the transaction was not profit-motivated. *See Fox*, 80 T.C. at 1011 (provisions for limited expenditure by other parties case doubt on

economic viability absent tax benefits). In other words, Baron's argument begs the more general question of whether *his* investment was "for profit." There would be no inconsistency, for example, in Casablanca's viewing as favorable consideration for the sale the $90,000 cash plus whatever payments might be made on the note,[10] while for Baron the real purpose of the investment lay in the tax benefits that he hoped to derive.

Baron also relies on *Siegel*, 78 T.C. 659, in arguing that the payment of $90,000 cash evidences economic rationality in the transaction. However, in that case, unlike here, the taxpayer demonstrated that his partnership investment in film distribution rights was reasonably expected to result in a cash-on-cash profit notwithstanding the unreasonably high value of the nonrecourse debt. 78 T.C. at 686–88, 700. Further, it is well settled that "[i]n determining whether an activity is engaged in for profit, all facts and circumstances with respect to the activity are to be taken into account." Treas.Reg. § 1.183–2(b), T.D. 7198; *Wildman*, 78 T.C. at 953. In *Siegel*, unlike the case *sub judice*, the evidence permitted the Tax Court to find other indicia of profit motivation on the part of the limited partners, including active participation in distribution, subsequent capital contributions to augment distribution, advertising and other marketing remedial measures to boost revenues, and relevant experience and expertise of some of the partners in the investment. 78 T.C. at 700–02. The absence herein of similar "objective facts," Treas.Reg. § 1.183–2(a), T.D. 7198 (1972), viewed in the context of the transaction as a whole, undermines Baron's position as to his profit motive. Baron also tries to legitimize his venture, particularly his failure to seek any prior independent appraisal of the rights, by asserting that he was entitled to rely upon the pre-purchase appraisal of Casablanca, the distributor. *Sheid*, 50 T.C.M. at 670. However, as discussed above, Baron has not shown that he had any reason to believe that, among the

---

**10.** See note 7, *supra*.

possible outcomes in the Casablanca appraisal, those that would generate a profit on his investment could reasonably be expected to occur.

## CONCLUSION

For the above reasons and those stated in the opinion of the Tax Court not inconsistent herewith, the judgment of the Tax Court is affirmed.