DONALD HAYDEN AND AGNES HAYDEN, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Hayden v. Commissioner
Docket Nos. 15799-82; 16861-82; 16863-82; 16864-82; 16866-82; 16867-82; 16981-82; 17306-82; 23036-82.
United States Tax Court
T.C. Memo 1988-310; 1988 Tax Ct. Memo LEXIS 340; 55 T.C.M. (CCH) 1290; T.C.M. (RIA) 88310; July 25, 1988
Howard K. Schwartz and Kieran F. Cunningham, for the petitioners. Timothy S. Murphy, for the respondent. TANNENWALD *341 MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined the following deficiencies in petitioners' Federal income tax: Docket No.
Petitioners
Year
Deficiency
15799-82
Donald D. and
1977
17,811.00
Agnes R. Hayden
1978
23,264.00
16861-82
William P. and
1977
20,514.00
Mary E. Young
1978
24,884.00
16863-82
Lidio and
1977
16,593.49
Patricia Medina
1978
19,135.64
16866-82
Donald L. and
1977
8,296.90
Judith H. Baltz
16864-82
Donald L. Baltz
1978
10,763.19
16867-82
Carl Nagy
1977
16,669.00
1978
21,618.00
16981-82
Dennis A. and
1977
16,593.50
Mary A. Lynch
1978
21,527.00
17306-82
Peter and
1977
6,519.00
Virginia Nunez
1978
13,431.00
23036-82
Robert J. and
1978
7,037.00
Julene Flynn
After concessions, we must determine whether Food Rethermalization Limited Partnership was entitled to various deductions with respect to the acquisition and subsequent exploitation of a license of the patent rights to an invention for reheating food and, in turn, whether petitioners are entitled to their distributive share of *342 such deductions. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits is incorporated herein by reference. Petitioners were all Michigan residents at the time that they filed their petitions. For the years in issue, all of the Federal income tax returns for the petitioners were filed with the Internal Revenue Service Center, Cincinnati, Ohio. In 1976, James SAouder (Souder) was a consultant involved in the design of hospital food preparation and service systems. He had approximately 10 years' experience in designing various systems for hospitals. Because of his consulting work, he was familiar with the systems then used to reheat hospital patients' food after it was prepared in the kitchen and transported to their floors. Those systems used microwave or convection ovens. He concluded that a better system could be designed using induction heating. The system would provide both a better product and labor savings when compared to the other systems for reheating foods. Souder contacted Lindsey Waldorf (Waldorf) for help in implementing his idea. They agreed to design and build a prototype for such a system. On March 20, 1975, they *343 filed patent application number 560,396 with the United States Patent Office. The claimed inventions were a method and apparatus for reheating food using induction heating and the specially designed containers in which the food was to be reheated. The Patent Office issued the following patents based on that application: number 4,020,310, on April 26, 1977, number 4,110,587 on August 29, 1978, and number 4,112,393 on September 5, 1978. Waldorf and Souder believed that the best method for exploiting the technology they were developing was to find a corporate sponsor that would have the financial capacity to complete the design of, and subsequently market, commercial products using it. (We will refer to the product using the technology as either the "Transtherm unit" or the "unit.") Souder solicited several manufacturers for this purpose including Market Forge, a division of Beatrice Foods Corporation. Market Forge, which was a leader in food services in hospitals, indicated that it had an interest in the technology. On March 22, 1976, Market Forge and Waldorf and Souder signed a Memo of Understanding (memo). Under the terms of the memo, Waldorf and Souder were to complete a *344 prototype of their invention at a cost of $ 25,000, assign their patents to the technology to Market Forge and assist in marketing and engineering the product. Waldorf and Souder also were to grant Market Forge a right of first refusal in the event that either or both made any additional developments that were related to the product developed by Market Forge. In return, Market Forge was to pay a royalty of $ 250 per unit for the first $ 1,000,000 in sales, and a royalty of $ 300 per unit for additional sales. After the memo was signed, Waldorf and Souder, and their attorney, Howard K. Schwartz (Schwartz), sent several letters to Market Forge regarding the memo's terms. By a letter to Henry Coletti (Coletti), Market Forge's vice president of sales and marketing, dated March 26, 1976, Waldorf and Souder indicated that they had agreed to grant Market Forge an exclusive license for use of the patents in a hospital food rethermalization system, rather than assign the entire patent to Market Forge. In addition, this letter requested clarification of several items in the memo and made reference to a "final license agreement" to be concluded in the future. By a second letter of the *345 same date, also to Coletti, Waldorf and Souder requested clarification of several other items, including the meaning of right of first refusal, the time limits for decisions by Market Forge and royalty rates in the event that Market Forge chose to lease the units or sell them at a very high price. A letter dated April 15, 1976, sent by Schwartz to Market Forge's attorney, indicated that there was continuing disagreement over the development costs, the royalty rates, the scope of the license, in particular its field of use, an the amount of time that Waldorf and Souder would be required to devote to the project without additional compensation. Another letter, discussing essentially the same issues that Schwartz discussed in his letter, was sent by Souder to Coletti on April 26, 1976. Souder developed projections of sales of the Transtherm unit over the life of the patent. His projections of sales in the hospital market showed the following results over the first 7 years: Year
Units Sold
Price
Sales
1977
360
$  7,000
$   2,520,000
1978
1,200
7,700
9,240,000
1979
1,800
8,500
15,300,000
1980
2,400
9,300
22,320,000
1981
3,000
10,000
30,000,000
1982
3,600
11,000
39,600,000
1983
3,600
12,000
43,200,000
Total
$ 162,180,000
*346 Souder projected annual sales of the unit in the hospital market for the remaining 10-year life of the patent at between $ 40 million and $ 47 million. [2] He also estimated sales of the unit in other markets, including schools, transportation and nursing homes. For the first 7 years, those projections showed the following results: Year
Sale
1977
- 0 -
1978
$   1,200,000
1979
9,300,000
1980
13,445,000
1981
19,980,000
1982
24,775,000
1983
33,655,800
Total
$ 102,355,800
He projected sales in other markets to grow to approximately $ 185 million annually after 17 years. [3]
Market Forge made its own projections before signing the *347 March 1976 memo. [4]Market Forge's projections were more pessimistic than Souder's because they allowed a longer development time and time for health and safety approvals from various organizations, such as, for example, Underwriters Laboratory. Waldorf and Souder wanted to sell their interests in the patent application in order to have a guaranteed cash flow and to have it more quickly than they would under a royalty arrangement with Market Forge. In September or October 1976, Waldorf and Souder were introduced to Robert Flynn (Flynn) and Peter Nunez (Nunez), who owned an organization that marketed financial products, life insurance, tax shelters and real estate investments. Flynn has a degree in hotel and restaurant management from Cornell University and had served from 1958 to 1963 as an officer in the Army Quartermaster Corps, where he had managed officers' clubs and hospitals. After viewing the prototype then available, informally *348 consulting with individuals at Cornell and reviewing Souder's market projections, Flynn began organizing clients to invest in Waldorf's and Souder's invention. Three entities were created in December 1976 to carry out the transaction. The first was Transtherm Limited Partnership (Transtherm), a Michigan limited partnership, with Waldorf and Souder as general partners. As their capital contribution to Transtherm, Waldorf and Souder transferred to it all of their right, title and interest in the pending patent application. The second was Patents Licensing International (PLI), a Michigan corporation, with Schwartz as the sole shareholder. The last was Food Rethermalization Limited Partnership (Food Rethermalization), also a Michigan limited partnership, with Nunez and Flynn as its general partners. Food Rethermalization has 11 limited partners, 9 of whom each purchased full partnership units and 2 of whom each purchased one-half of a unit. [5] A full unit required a total investment of $ 52,000 -- $ 3,250 was required in December 1976, $ 6,750 was evidenced by a non-interest-bearing installment note and $ 42,000 was evidenced by an installment note bearing 7-percent interest. [6] Donald *349 Baltz, who purchased one-half of a unit, signed promissory notes for $ 3,375 and $ 21,000. Before investing, the limited partners were provided with an offering memorandum that described the patents, the transactions and the parties thereto, indicated that Market Forge was then involved in the development of commercial products and listed several economic risk factors to be considered. In addition, 6 of the 17 pages were devoted to the tax considerations of the transaction. The potential limited partners were provided, by means of a separate document, with the market projections prepared by Souder, as well as the promotional material he had used *350 in soliciting manufacturers. They were also afforded the opportunity to view a demonstration of the unit, although not all of them did. In December 1976, none of the parties involved in the formation of the three entities, except Waldorf and Souder, anticipated that they or the entities would be involved in the continued development of commercial products utilizing the inventions or in the active marketing of the Transtherm units. They anticipated that the work would be done by Market Forge, with Waldorf and Souder assisting on a consulting basis. On December 29, 1976, Transtherm transferred all of its right, title and interest in the patent application to PLI, in exchange for between 5 percent and 7-1/2 percent of the revenue derived from exploitation of the invention, with the exact percentage depending on royalties received by PLI. At or about the same time, PLI entered into a 7-year Exclusive License Agreement (license agreement) with Food Rethermalization. Under the license agreement, Food Rethermalization was to pay PLI an $ 80,000 consulting fee, $ 30,000 of which was to be paid upon execution of the license agreement with the balance to be paid by May 15, 1977. The *351 payment due on May 15, 1977, was evidenced by a promissory note. Both of these amounts were paid. Food Rethermalization also was to pay PLI a $ 3,320,000 license fee. $ 420,000 of the license fee was evidenced by a full recourse installment note, bearing interest at 7 percent per year, to be fully paid by December 1, 1981. [7] The first three installments on the note, totalling $ 250,000, were paid, the remaining installments were not. The $ 2,900,000 balance of the license fee, bearing interest at 7 percent per annum, was evidenced by a nonrecourse promissory note which was due and payable in December 1983. Thirty percent of Food Rethermalization's gross income from exploiting the inventions was to be used to retire the nonrecourse note. Because no income was received by Food Rethermalization, no payments were made on the nonrecourse note. *352 The license agreement contained an option to renew at the end of the 7-year term for the remaining life of the patents, upon payment of the greater of $ 25,000 or 3 percent of the income received by Food Rethermalization from exploitation of the inventions during the initial term. In the event the license agreement was renewed, the due date of the $ 2,900,000 nonrecouse note was similarly extended. The license agreement was renewed after 7 years, and Schwartz, on behalf of PLI, waived the $ 25,000 fee. In early 1977, Transtherm, PLI and Food Rethermalization signed an agreement with Market Forge in which they granted Market Forge an exclusive license to use the patents for the patents' lives. Under this agreement, the field of use of the patent was limited to the mass feeding market which shall include (1) health care facilities such as hospitals and nursing homes, (2) military installations, (3) correctional institutions and prisons, (4) transportation facilities such as airplanes, trains and ships, (5) educational facilities such as schools and colleges, (6) restaurants including fast food chains, (7) industrial facilities, (8) caterers and mobile food facilities (meals *353 on wheels) and (9) other institutional uses. Market Forge agreed to pay royalties of 4 percent of annual sales up to $ 5,000,000, and 5 percent of annual sales thereafter. Assuming that Souder's sales projections were accurate, and using those royalty rates, Food Rethermalization would receive the following royalties: [8]
Year
Royalties
Total
(Hospital)
Royalties
1977
$   100,800
$   100,800
1978
412,000
472,000
1979
715,000
1,180,000
1980
1,066,000
1,738,250
1981
1,450,000
2,449,000
1982
1,930,000
3,168,750
1983
2,146,000
3,829,290
1984
2,362,000
4,493,070
1985
2,392,000
5,076,175
1986
2,380,000
5,622,595
During 1977, Market Forge continued to work on the development of the Transtherm unit. Problems were experienced in finishing the prototype, partly because of attempts to increase its performance level. Because the projected cost of the unit was increasing, Market Forge felt that it would be more difficult to market than they had anticipated. Finally, Market Forge was unable to locate a dish supplier who could *354 produce dishes with the necessary metal content (to control heating) that also looked like ordinary china plates, which was a key element in marketing the unit. Because of these difficulties, Market Forge withdrew its support on June 26, 1978. On its 1977 Federal partnership tax return, Food Rethermalization claimed an amortization deduction for the license agreement, using a 7-year life and claiming that the agreement had been in service for two-thirds of the year. On its 1978 Federal partnership tax return, Food Rethermalization claimed a full year amortization deduction with respect to the license agreement. OPINION Respondent has taken a blunderbuss approach to the instant case with the result that the parties have directed their arguments to several issues. We prefer the rifle approach and will direct our attention to what we consider to be the critical issue, namely whether Food Rethermalization entered into the transactions with the requisite profit objective. [9]The burden off proof is on the petitioners. [10]Rule 142(a); [11]Taube v. Commissioner,88 T.C. 464, 480 (1987). *355 We hold that they have failed to carry that burden. *356 Section 162(a) allows a deduction for the ordinary and necessary expenses of a trade or business, and section 212 allows a deduction for such expenses paid or incurred for the production of income. Section 167(a) allows depreciation deductions for property used in a trade or business or held for the production of income. Respondent's regulations indicate that intangible assets with limited useful lives, such as patents, are also subject to an allowance for depreciation. Secs. 1.167(a)-3 and 1.167(a)-6, Income Tax Regs.
The threshold element in determining whether an activity is a trade or business or carried on for the production of income is a showing that the activity was entered into with an "actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Although the expectation need not be reasonable, it must be shown that a bona fide objective of making a profit did exist. *357 Taube v. Commissioner,88 T.C. at 478-479. Profit in this context, as a threshold matter, [12] means economic profit, independent of tax savings. Drobny v. Commissioner,86 T.C. 1326, 1341 (1986). The determination is made at the partnership level, Taube v. Commissioner,88 T.C. at 478, and our focus is on the general partners. 88 T.C. at 480. The existence of the requisite objective is a question of fact to be determined from all the facts and circumstances. Dreicer v. Commissioner,78 T.C. at 645. The regulations promulgated under section 183 list nine factors that should be taken into account in determining whether an activity is engaged in for profit. Sec. 1.183-2(b)(1)-(9), Income Tax Regs. This is intended, however, as only a partial list. Sec. 1.183-2(b), Income Tax Regs. We see no need to discuss each factor; rather, we will *358 deal with the entire record in the context of the parties' arguments. See Taube v. Commissioner,88 T.C. at 479-481. Petitioners argue that Market Forge's involvement in the transaction indicates that the technology was a good business proposition and that Flynn and Nunez had sufficient expertise to evaluate the technology and Souder's projections, so that the partnership entered into the transaction with the requisite profit objective. Respondent argues that Flynn and Nunez failed to make sufficient inquiries (in particular of Market Forge), that the transaction was not an arm's-length transaction and that the price paid for the patent license by Food Rethermalization bore no reasonable relationship to the license's fair market value, so that the transaction lacked economic substance. We agree with respondent. [13]
*359 First, we agree with petitioners that Market Forge's involvement in the transaction establishes that there was some market for the Transtherm units. It does not show, however, that the transaction which Food Rethermalization entered into with PLI had a profit objective or was potentially profitable. The terms of that transaction were substantially different from the terms of the transaction between Market Forge and Food Rethermalization, PLI and Transtherm. We must judge Food Rethermalization's transaction with PLI on its own merits, albeit Market Forge's presence has an impact on our analysis. Second, we note that Flynn had experience in the institutional feeding area and consulted with people who were knowledgeable in that field before entering into this transaction. This experience would be sufficient for some purposes in the transaction, for example, determining that the Transtherm units met a need in the marketplace. We think it is not sufficient for other purposes, in particular for evaluating Souder's projections, because Flynn's experience was dated and, in general, in the area of operating food service establishments rather than in developing equipment for them, and *360 because his consultations with outside experts were not sufficient to allow him to evaluate the detailed projections. To the extent that these factors help establish Food Rethermalization's profit objective, other facts of record outweigh them. Flynn and Nunez were relying in part on the presence of Market Forge in the picture. The record, however, is devoid of evidence of any attempts by either Flynn or Nunez to determine the significance of Market Forge's presence, in particular how successful Market Forge expected the inventions to be and what, if any, potential difficulties existed in constructing the prototype of a marketable product. [14]
Flynn and Nunez also relied in part on Souder's projections, evaluated in light of their experience. As we have noted, however, petitioners have not shown that that experience was sufficient to allow them to evaluate Souder's projections, and we *361 think that Flynn's and Nunez' reliance was unreasonable, given the flaws that are evident in Souder's projections. The projections were developed with an eye to selling the patent rights, first to Market Forge, then to Food Rethermalization. It is clear that they failed to allow time for development and regulatory approval. Market Forge, in its projections, allowed 3 years for development and regulatory approval. Petitioners assert that this is merely a timing difference between Souder's projections and Market Forge's projections, and that, in other respects, the projections are substantially the same. This is not established by the record. [15] In any event, a 3-year timing difference in a transaction of 7 years duration is too substantial a timing difference for us to ignore. [16]
*362 We also do not think that Souder's projections of the non-hospital markets are reliable. Souder was a consultant in the hospital field, but he did not have experience in other areas of food service, so we seriously doubt his ability to develop realistic projections for these areas based on his own knowledge. In addition, because Market Forge was a leader in hospital feeding but had no experience in other areas, making a rapid expansion into those areas would be unlikely. Souder's projections, however, showed it occurring almost immediately. finally, there is no evidence in the record, other than Souder's uncorroborated testimony, that it would be feasible to use Transtherm units in the other markets. We further note that, even if Souder's projections were entirely correct, the 7-year promissory note given PLI by Food Rethermalization would not have been paid when the license agreement expired. Assuming that only the hospital market was exploited, but that it was exploited as rapidly and successfully as Souder projected that it would be (see page 6, supra), the note would not have been fully paid until 1986, 10 years after the license agreement was signed. [17] Assuming *363 that all markets for which Souder developed projections were exploited, which we consider implausible, the note would not have been fully paid until 1984, 8 years after the license agreement was signed. In each case, as the tables in note 17 reveal, a substantial sum of money would have been required to pay off the balance due -- even larger sums would have been required if only Souder's conservative projections had materialized. Similarly, substantial sums would have been required to extend the license agreement. [18]
*364 The long and the short of the matter is that Souder's projections had sufficient weaknesses both in and of themselves, and in terms of Souder's qualifications to make them, to cause us to characterize them as unrealistic. As we have previously pointed out, while Flynn and Nunez may have had sufficient experience and information to determine that there was a market for the unit, they were not in a position to determine its size or the financial rewards that might be expected, and it is clear that they did not take adequate measures to test the reliability of Souder's projections as the foundation for the transaction they structured. [19] We are satisfied that the primary concern of Flynn and Nunez was the tax benefits which they hoped would flow from the transaction to the investors in Food Rethermalization; [20] the most that can be said is that they were indifferent to the success of the venture as a business proposition. See Baron v. Commissioner,83 T.C. 542, 563 (1984), affd. 798 F.2d 65 (2d Cir. 1986). *365 We hold, based on all the facts and circumstances in the record, that petitioners have not carried their burden of proof that the transactions were entered into with a bona fide profit objective. Because of our conclusion on this issue, we do not reach the other issues involved herein. See note 9, supra. Decisions will be entered for the respondent.
Footnotes
1. Cases of the following petitioners are consolidated herewith for trial, briefing and opinion: William P. Young and Mary E. Young, docket No. 16861-82; Lidio Medina and Patricia Medina, docket No. 16863-82; Donald L. Baltz, docket No. 16864-82; Donald L. Baltz and Judith H. Baltz, docket No. 16866-82; Carl Nagy, docket No. 16867-82; Dennis A. Lynch and Mary A. Lynch, docket No. 16981-82; Peter Nunez and Virginia Nunez, docket No. 17306-82; and Robert J. Flynn and Julene F. Flynn, docket No. 23036-82. ↩
2. Souder also included in his projections more conservative estimates which would have produced total sales of $ 81,600,000 in the hospital market over the first 7 years and annual sales of between $ 22 million and $ 40 million thereafter.↩
3. Souder also included in his projections more conservative estimates which would have produced total sales of $ 45,790,000 in the other markets over the first 7 years and an annual rate of sales of $ 57 million after 17 years. ↩
4. Market Forge projected that sales would begin in 1980, annual sales would reach $ 13 million by 1985 and that cumulative sales would total $ 32 million to $ 33 million in 1985. Further details of these projections are not in the record. ↩
5. Six of the limited partners are petitioners here, each of whom purchased a full unit, except for Donald Baltz, who purchased one-half of a unit. ↩
6. Payments on the two notes were to be made as follows: ↩
$ 6,750 note
$ 42,000 note
May 1977
$ 5,000.00
--  December 1977
500.00
$ 10,000.00
May 1978
--   7,500.00
December 1978
500.00
7,500.50
May 1979
--   7,500.50
December 1979
500.00
7,500.50
May 1980
250.00
8,780.50
Total -- including interest
$ 6,750.00
$ 48,782.00
7. The schedule of payments was as follows: Date Due
Principal
Interest
Total
Unpaid Balance
Dec. 15, 1977
$ 71,600
$ 29,400
$ 100,000
$ 348,400
May 15, 1978
62,800
12,200
75,000
285,600
Dec. 15, 1978
65,000
10,000
75,000
220,600
May 15, 1979
67,090
9,910
75,000
153,510
Dec. 15, 1979
69,620
5,380
75,000
83,890
May 15, 1980
83,890
2,910
86,800
- 0 - There is obviously a $ 1,000 error in the amounts due on Dec. 15, 1977. ↩
8. Souder's projections (see page 6, supra↩) contained these same amounts of estimated royalties. 9. The other issues are whether: (1) Food Rethermalization purchased and retained rights in the patents that it allegedly acquired from PLI; (2) the patents at issue had an amortizable basis; (3) the nonrecourse promissory note from Food Rethermalization to PLI constituted genuine indebtedness fully includable in the patent license's basis for determining amortization; and (4) the patent license's useful life was 7 or 17 years. Petitioners suggest, in their reply brief, that respondent failed to address the profit objective issue in his original brief and has therefore conceded the issue. We disagree. We think that the profit objective issue was clearly manifested at the trial, was implicitly involved in the arguments set forth in respondent's original brief and explicitly argued in respondent's reply brief. ↩
10. Subsumed in the arguments in respect of some of the other issues, see note 9, supra,↩ were various contentions as to the location of the burden of going forward as well as the burden of proof. We find it unnecessary to deal with these arguments. 11. All Rule references are to the Tax Court Rules of Practice and Procedure, and, unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect during the years in issue. ↩
12. See Estate of Baron v. Commissioner,83 T.C. 542, 557-558 (1984), affd. 798 F.2d 65↩ (2d Cir. 1986). 13. Respondent cast his arguments in terms of economic substance, citing Rose v. Commissioner,88 T.C. 386 (1987), on appeal (6th Cir., Dec. 14, 1987). We will address those arguments in the context of our section 183 analysis. First, we are not convinced that this transaction constitutes a generic tax shelter as that term was defined in Rose, see 88 T.C. at 412, given that the general partners of Food Rethermalization had interests that were in part adverse to Waldorf's and Souder's interests and that the nonrecourse financing served as an incentive to Waldorf and Souder to continue to work on the development of the Transtherm units, which of course had not been completed when the licensing agreement was signed. In addition, respondent first addressed the question of the transaction's economic substance in his reply brief, so that petitioners, who made their argument in their brief in the context of section 183, were not afforded an opportunity to respond to respondent's specific arguments in the new context. Since both parties generally argued only the objective facts, we would reach the same result if we proceeded to adopt the economic substance test of Rose. Cf. Taube v. Commissioner,88 T.C. 464, 481↩ n.25 (1987). 14. We note that as late as February 1977 the commercial feasibility of the product had yet to be established; the agreement with Market Forge stated that a prototype was being constructed which would permit Market Forge to "determine whether or not the product is commercially feasible." ↩
15. Market Forge estimated hospital sales of $ 13 million in 1985, the sixth year of marketing the Transtherm unit, see n. 4, supra.↩ Souder estimated sales of almost $ 40 million in the sixth year of marketing the unit. Whether this disparity continued in later years is not in the record. 16. We note that, had Flynn or Nunez discussed this transaction with an individual who was knowledgeable in developing products for the hospital market, they would have discovered this flaw in the projection. ↩
17. The following charts represent the repayment schedules of the notes. Hospital Sales Only
Begining
Payment
Ending
Year
Royalty
Balance
Interest
(30 Percent)
Balance
1977
$   100,800
$ 2,900,000
$ 101,500
$  30,240
$ 2,971,260
1978
412,000
2,971,260
207,988
123,600
3,055,648
1979
915,000
3,055,648
213,895
274,500
2,995,043
1980
1,066,000
2,995,043
209,653
319,800
2,884,896
1981
1,450,000
2,884,896
201,942
435,000
2,651,839
1982
1,193,000
2,651,839
185,628
579,000
2,258,468
1983
2,146,000
2,258,468
158,092
643,800
1,772,760
1984
2,362,000
1,772,760
124,093
708,600
1,188,254
1985
2,392,000
1,188,254
83,178
717,600
553,832
1986
2,380,000
553,832
38,768
592,600
- 0 -  Sales in All Markets
Begining
Payment
Ending
Year
Royalty
Balance
Interest
(30 Percent)
Balance
1977
$   100,800
$ 2,900,000
$ 101,500
$    30,240
$ 2,971,260
1978
472,000
2,971,260
207,988
141,600
3,037,648
1979
1,180,000
3,037,648
212,635
354,000
2,896,283
1980
1,738,250
2,896,283
202,739
521,475
2,577,548
1981
2,449,000
2,577,548
180,428
734,700
2,023,276
1982
3,168,750
2,023,276
141,629
950,625
1,214,281
1983
3,829,290
1,214,281
84,900
1,148,787
150,494
1984
4,493,070
150,494
10,535
161,029
- 0 -  For simplicity, we assume that one payment would be made on the4 note, on June 30 of the particular year. This closely approximates the results that one would occur with steady payments over the course of the year. ↩
18. Utilizing 3 percent of cumulative royalties, see page 11, supra,↩ the renewal fee would have been as follows: $ 388,143 based on Souder's most optimistic total sales projections, $ 181,581 based on his conservative total sales projections, $ 234,564 based on Souder's most optimistic hospital sales projections and $ 113,064 based on his conservative hospital sales projections. 19. We find ourselves unable to relate the $ 3.4 million price which Food Rethermalization contracted to pay PLI in the license agreement to any specific figures in Souder's projections, and the record herein does no more than reveal general statements that this amount was "negotiated" without indicating any underlying analysis. ↩
20. It is not without significance, as respondent points out and petitioners do not dispute, that as of December 31, 1978, each investor would have obtained more in tax savings as a result of his investment than he was personally liable for and that the tax savings would continue to be realized in the next 5 years. That these tax savings might ultimately have been reduced by a tax liability for recapture has not been claimed by petitioners and, in any event, is too speculative an element under the circumstances of this case to be taken into account. Cf. Baron v. Commissioner,798 F.2d 65, 73-74 (2d Cir. 1986), affg. 83 T.C. 542↩ (1984).