ROBERT O. CARLSON AND EILEEN E. CARLSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Carlson v. Commissioner
Docket Nos. 29273-83, 35742-84.
United States Tax Court
T.C. Memo 1987-306; 1987 Tax Ct. Memo LEXIS 306; 53 T.C.M. (CCH) 1176; T.C.M. (RIA) 87306; June 23, 1987. Robert A. Trevisani and Arthur B. Crozier, for the petitioners. *307 Anne Hintermeister and Dennis M. Bresnan, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined deficiencies in petitioners' Federal income tax in these consolidated cases as follows: Year
Amount
1976
13,166.62
1977
37,455.17
1979
40,340.00
After concessions, the issues presented for decision are: (1) Whether petitioners are entitled to deductions claimed as their distributive share of the losses of Benton Harbor Associates, a New Jersey Limited Partnership, for the years in issue; (2) whether petitioners are entitled to an investment tax credit, representing their distributive share of the investment tax credit claimed by Benton Harbor Associates; and (3) whether the transactions at issue were tax motivated so that increased interest under section 6621(c) is required. [1]
*308 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulations of facts, and exhibits attached thereto are incorporated herein by this reference. Eileen E. Carlson (Eileen or petitioner) and Robert O. Carlson (Robert) were husband and wife and residents of Tuxedo Park, New York, at all times relevant to this case. Eileen and Robert (collectively petitioners) timely filed joint Federal income tax returns for their taxable years 1976, 1977, 1978, 1979 and 1984, using the cash receipts and disbursements method of accounting. Eileen is a graduate of Yale Law School and New York University's Graduate School of Business Administration. Currently, she is President and Chief Executive Officer of Arthur J. Evers Corporation, whose business is manufacturing printing presses, cutters, creasers and related machines for converting of paper. Robert holds a Ph.D. from Columbia University and is a professor of Marketing and Business Policy. General Background
In 1973, the City Commission of the city of Benton Harbor (Benton Harbor or City), Michigan, granted a cable television franchise to Earl Drake. [2] In various forms, *309 Drake held the franchise until 1976. On May 7, 1976, Benton Harbor Cable TV, Inc. (BHCT, Inc.), entered into a cable television franchise agreement with the City. (Drake was then president and sole shareholder of BHCT, Inc.) This franchise agreement granted to BHCT, Inc. a 15-year nonexclusive franchise to construct, maintain and operate a cable television transmission system in the City. [3] BHCT, Inc. as franchise holder was authorized to charge subscribers the following rates: monthly service charge $5.95 or $7.95, an additional outlet charge of $1.50, an installation charge of $20, and a frequency modulation charge of $1.00. BHCT, Inc. could not increase the rates without prior City approval. If BHCT, Inc. failed to follow any specifications of the franchise agreement, the City had a right to terminate the franchise. The City is the only area covered by the above franchise. A separate franchise exists with respect to Benton Township, which was built by another entity. See n. 24, infra.
*310 On July 20, 1976, BFM Constructors, Inc. (BFM) purchased all of the stock of BHCT, Inc. from Drake for $5,000. On September 22, 1976, BFM sold the stock to Benton Harbor Associates (BHA or Partnership) for $25,000. [4]
In 1976, Jack Isaacson (Isaacson) was searching for potential purchasers of BFM cable television systems. Isaacson met Richard Siegal (Siegal) *311 through one of Siegal's clients, Konigsberg & Wolf, an accounting firm. Isaacson proposed to Siegal that Siegal become involved and help structure the deals that BFM was putting together. Isaacson also suggested that Siegal become the general partner in two of the limited partnerships that BFM was affiliated with -- BHA and La Junta. [5]
Siegal and Isaacson visited BFM's offices in Connecticut together. There Siegal met Frank Pitassi (Pitassi), [6] John Galanis (Galanis), and others. Siegal also talked with a partner of his former law firm about risks and exposures involved with being a general partner. [7] Siegal then agreed to become the sole general partner of BHA. *312 Prior to 1976, Siegal had no prior experience in the cable television industry. Siegal's experience and education largely were in law and business. He is a practicing attorney with a masters in taxation degree and a certified public accountant. The Alron Report
Jack Scheinman (Scheinman) of Alron Communications, Inc. (Alron) was recommended to Isaacson and Siegal by Paul Konigsberg (Konigsberg) as an expert in cable television. Siegal retained Scheinman on behalf of the partnership to see if the proposed system was workable and if BFM was capable of putting the system together. Siegal worked out an arrangement with Scheinman whereby Scheinman would be a consultant to the partnership for a period of years. Scheinman's role was to monitor construction and to evaluate management and management's performance. Scheinman was to visit the site annually; his fees were to be paid by the partnership, unless it failed to be funded, in which event Isaacson would pay the bill. Scheinman submitted a 3-page report, dated September 20, 1976, concerning the economic viability of the partnership. The report assumed that the contemplated system would have 60 miles of plant and would *313 pass 8,500 homes (i.e., possible customers), and stated that the price of construction of $990,000 "while at the top of the scale of parameters for such a build, is acceptable, bearing in mind the fact that the builder 'BFM Construction, Inc.' is being subject to delayed payments makes for a unique but understandable extra consideration." The report also stated that "When the projected subscriber and revenue is reached, $400 as a basis for sales price falls within the lower level of estimates by expert opinion among the more cognizant members of the Cable Industry community." The report did not otherwise state the basis for its conclusions, nor did it contain any projections of revenues, income, expenses, or profits. Scheinman was Alron's only employee. He prepared appraisal reports only for BFM partnerships. Scheinman worked for Alron through March 1978, and in April 1978, died of cancer. The Private Offering Memorandum
A private offering memorandum (memorandum), dated August 16, 1976, explaining the transactions to be entered into by BHA and a legal opinion explaining the tax consequences of the transactions were prepared and used to obtain limited partners. The memorandum *314 stated that upon completion of the offering, BHA was to enter into simultaneous agreements: (1) with BFM (a) to acquire a franchise, and (b) to construct the community antenna television system (system) in the City; and (2) with Benton Harbor Cable Management Company (BCM) to operate and maintain the system for the initial term of the franchise. The memorandum also provided that BHA would enter into financing agreements: (1) with BFM for the construction of the system, at a total price of $990,000 ($80,000 to be paid in cash on the commencement of construction; the balance by execution of a non-recourse promissory note to BFM); and (2) with North Country Financial Corporation (an affiliate company of Pitassi), for a total amount of $548,000 (over a 3-year period), to be used by BHA in its business activities. The memorandum provided that Siegal (as general partner) would receive a management fee of $90,000 during 1976; $1,000 in 1977; and $3,500 per year starting in 1978. Siegal was also required to make a $1,000 contribution to capital, for which he would receive a 2-percent interest in the partnership. In the event of a sale or refinancing of the system, the agreement provided *315 that Siegal would be entitled to 40 percent of any profit, after the limited partners recouped their initial capital contributions. The private offering memorandum specifically listed as a risk factor that Siegal did not have "any prior experience in the CATV industry and will be required to depend upon the advice of independent consultants for technical background to evaluate the construction of the system and the performance of [BCM]." The memorandum further stated that "[BHA] will seek the services of qualified consultants, [but] no assurance can be given relative to the ability of [BHA] to locate and retain such consultants and the level of their performance." Additionally, the memorandum warned that Siegal would devote only a limited amount of time to BHA, that he may be a general partner in other BFM deals, and that BCM may be involved in other CATV systems as well. Assuming the sale of the limited partnership units and the contribution of the general partner ($1,000), the gross contributions to be received by the partnership would amount to $551,000. Sales of limited partnership units were to be made only to persons of at least 21 years of age meeting certain minimum *316 standards of income and net worth, [8] who were in a position to benefit from the applicable tax laws with respect to such investments, who had prior investment experience or had consulted a professional advisor, and who understood the speculative nature of the investment. The memorandum disclosed that BCM was to manage the system, and was to be organized as a limited partnership with BFM as the general partner and S.C. Orlicki, Inc., [9] as the limited partner. The memorandum represented that Frank J. Pitassi was president and founder of BFM; that BFM and its affiliated companies were engaged in real estate construction and acquisition and management consulting activities; that Pitassi had a lot of experience in the construction and cable industries; that BFM had been involved in utilities installation; and that currently it had 75 full-time employees. *317 The memorandum warned that to the extent that BCM was unable or unwilling to fulfill its obligations with respect to the maintenance of the system, the Partnership would be required to maintain the same, and look to BCM for costs or damages sustained. BCM's initial capitalization was $50,000, and the memorandum warned that the capitalization was "not adequate to fully reimburse the Partnership for any losses." [10]
The memorandum estimated the number of subscribers to be: Year
Number of Subscribers
1977
1,062
1978
1,931
1979
3,219
1980
3,502
1981
3,979
1982
4,465
The estimated revenues and expenses of the system, the estimated revenues and expenses of the partnership and the estimated sources and applications of funds provided in the memorandum are set forth in Appendices A, B and C, respectively, to this opinion. [11] The memorandum contained a warning that -- THERE CAN BE NO ASSURANCE THAT THE REVENUES WILL BE ACHIEVED BY THE SYSTEM TO PAY THE REVENUES PROJECTED FOR THE PARTNERSHIP AND NO REPRESENTATION TO THIS EFFECT CAN BE MADE. THE *318 FIGURES REPRESENT ONLY ESTIMATE [sic] AND ARE QUALIFIED BY THE EXPLANATORY MATERIAL CONTAINED IN THIS PRIVATE OFFERING MEMORANDUM. The estimated cash flow and other projections contained in the memorandum were based, in part, on the availability of Pay TV or Home Box Office. [12]
The memorandum contained no mention or reference to a gain on ultimate disposition of the system. The Tax Opinion
Allan T. Cannon (Cannon), an attorney, at Isaacson's request, prepared the tax opinion, dated August 16, 1976, explaining the Federal income tax consequences to *319 BHA and its partners in connection with the acquisition of the franchise to operate the CATV system in the City, the acquisition of the equipment and cable net work used to operate the system, the noncompetition agreement, and the agreement with BCM for the management of the CATV system. Cannon also prepared a supplementary tax opinion, dated September 21, 1976. Both opinions were addressed to Siegal. In preparing the original tax opinion letter, Cannon reviewed drafts of the agreements connected with the confidential memorandum [13] and relied on the projections of income and expenses. Cannon did not independently check the assumptions upon which the income projections were based. Cannon made inquiries about the CATV business, and purportedly satisfied himself that a profit potential was present by relying on Siegal's optimism and the figures relating to cash flow and ultimate disposition. In the latter connection, Cannon initially was concerned about the balloon payment at the final due date of the promissory notes (or possibility of refinancing), but relied on the fact that he had been told that the value of the system's appreciation would enable a refinancing at that later *320 time. Similarly, although other than a purchase option granted to BCM, there was no mention in the projections as to the sale of the system, Cannon purportedly satisfied himself about such possibility. The Agreements
On September 22, 1976, BFM and BHA executed the following documents: (1) construction agreement, (2) financing agreement, (3) warranty agreement, (4) equipment supply agreement, and (5) management agreement. The construction and financing agreements provided that the partnership would be indebted to BFM and would borrow funds from North Country Financial, an affiliate of BFM. All of the obligations were nonrecourse. Under the terms of the agreement with BFM, the partnership would pay BFM $80,000 in cash and defer the $910,000 balance of the payments to BFM for the construction of the system and the installation of equipment. [14] The $910,000 was payable as follows: Date
Principal
Interest
12/1/76
Interest only at 12%
1/2/77
Interest only at 6.5%
1/2/78
Interest only at 6.5%
1/2/79
60,000
And interest at 6.5%
1/2/80
60,000
And interest at 6.5%
1/2/81
60,000
And interest at 6.5%
1/2/82
60,000
And interest at 6.5%
1/2/83
60,000
And interest at 6.5%
1/2/84
60,000
And interest at 6.5%
1/2/85
60,000
And interest at 6.5%
1/2/86
60,000
And interest at 6.5%
1/2/87
60,000
And interest at 6.5%
1/2/88
370,000
And interest at 6.5%
*321 The note was to be repaid from the revenue proceeds to be disbursed to BHA by BCM. [15]
It is unusual in the industry to have nonrecourse debt with a longer term than the useful life of the assets securing it. Cable television debt generally tends to be around 5 to 7 years, which is considered to be the normal useful life of the equipment involved. BFM was to supply BHA with a certificate of completion by an independent consulting engineer, certifying that the system was complete. Any subsequent use of the system by BHA was to constitute an acceptance of the system. BFM agreed to warrant all materials, equipment, and design defects for a period of 90 days from BHA's date of acceptance. BHA was given an option exercisable within said 90-day period to extend this warranty for 2 years upon payment of $99,000. BHA and BFM entered into a security agreement stipulating that the construction note was secured by all of BHA's tangible and intangible assets. The construction *322 agreement also gave BFM the right to purchase on behalf of BHA up to $300,000 of additional equipment (beyond that covered by the $990,000) to be used in the system to be constructed and to accord the suppliers security interests therein. BFM also was obligated to furnish BHA evidence that it had paid the monies due to such suppliers at each calendar quarter end. In the event that BFM failed to make such payments, BHA was entitled to make any overdue payments and deduct a corresponding amount from the next payment scheduled to BFM. The equipment supply agreement was purportedly secured by a prior security interest in the system and franchises and contracts connected therewith. BHA also entered into an agreement with Jerrold Electronics Corporation (Jerrold), dated September 22, 1976, whereby BHA could purchase up to $150,000 of cable and other equipment at specified prices, and Jerrold would be given a first lien on the system. [16] BFM purportedly guaranteed BHA's obligations to Jerrold. *323 BHA and BCM entered into a management agreement (management agreement) and an amendment, both dated September 22, 1976. The management agreement provided that BCM would have the sole and exclusive right to operate and maintain the CATV system, from September 22, 1976 through May 6, 1991, unless the agreement was terminated sooner. BHA was to retain net revenues as follows: 1976 - $10,000; 1977 - $50,000; 1978 - $60,000; and 1979 - $175,000. From 1980, and for so long as the agreement remained in effect, BHA was to retain $185,000 from net revenues. In the event that net revenues were less than the amounts indicated, BCM agreed to pay BHA an amount sufficient for BHA to net the amount specified. The agreement further provided that in any year that all subscription revenues [17] exceeded $250,000, BHA would retain an additional 10 percent of revenues. [18] All revenues (less operational expenses) in excess of those paid to BHA were to be paid to BCM as compensation. Under the agreement, BCM warranted, inter alia, to use its best efforts to obtain subscribers; to pay all expenses relating to the operation of the system and to pay any expenses in excess of revenues; to maintain the *324 equipment in good repair; and to comply with the franchises described herein. Additionally, BCM was required to provide BHA with a statement of the gross amount of subscription revenue within 60 days from the end of each calendar year. BCM or BHA could terminate the management agreement if the franchise were revoked (unless the revocation was due to actions of the terminating party) or if the other party was in default. Additionally, if BCM failed to exercise its purchase option, [19] BHA could terminate the agreement upon sale to a third party subsequent to January 1, 1985. *325 Under the agreement, BHA was to pay $100,000 in 1976 and $50,000 in 1977 as an advertising allowance; [20] and $100,000 in 1976 as consideration for a covenant from BCM not to compete. [21] In 1976, under the amended management agreement, BHA also transmitted $220,000 to BCM as an estimated prepayment of expenses. [22] The amendment also provided that BCM would provide an accounting of funds so transferred. Several of the provisions in the management ageement were not common in the industry. For example, the seller of a franchise normally *326 maintained no continuing relationship with the buyer. Additionally, the fee arrangement between BCM and BHA was unusual. Normally, the manager received 5 to 6 percent of the system's revenues as commissions. Similarly, the noncompetition fee was unnecessary in large part because, due to the fee arrangement, BCM would have an incentive to increase gross revenues rather than to compete with the system. Finally, the additional 2-year warranty was unusual in the industry. The financing agreement, dated September 22, 1976, between North Country Financial Corporation (North Country) and BHA, provided that North Country would lend $548,000 [23] to BHA on a nonrecourse basis in exchange for a $42,000 payment with interest at 8 percent per annum to be payable annually on January 2 of each year and principal and accrued but unpaid interest to become due and payable in full on January 2, 1988. The North Country loan was secured by a second mortgage on the system, franchise and stock. The proceeds of the loan were to be used to pay fees, operating expenses, *327 and interest costs. The memorandum noted that the terms of the loan were such that a refinancing might be necessary in order to avoid a loss of the system, when the obligations became due. All agreements and related documents were executed at the closing on September 22, 1976, but were to be held in escrow until September 30, 1976, at which time various conditions were to be met, including BHA's receipt of a $150,000 performance bond from BFM with respect to the system's construction, a letter from City authorities stating no objection to the transfer of stock of the franchise, and the reissuance to BFM of notes in the amount of $374,000 from the limited partners. Subsequent Events and Other Pertinent Facts
BFM retained a subcontractor, Arrow Cable TV, Inc. (Arrow) to construct the City system, as well as other cable TV systems that BFM was involved in. Arrow was owned by Drake. The estimated total cost for the construction of both the system and the system for Benton Township was $450,000. [24] Arrow was to receive 5 percent of the estimated project costs as compensation, plus 50 percent of any savings if actual project costs were less than estimated. *328 The original mapping of the area was done by Drake and was inadequate. Additionally, what construction Arrow did proved to be inadequate; a tower Arrow built had to be torn down because it could not be used in a cable television system. BFM terminated its contractual relationship as set forth in the July, 1976 contracts with Arrow with respect to the system on March 10, 1977. Antenna Specialties (Antenna) replaced Arrow as subcontractor. Siegal was concerned that the system be placed in service in 1976 for investment tax credit (ITC) purposes. He called BFM personnel several times in December 1976, for that reason. Siegal was assured that the system was in service in 1976. On April 26, 1977, BHA received a certificate of completion, dated December 31, 1976, signed by Roy Ingram, certifying that the construction of the BHA system was complete. [25]
Actually, the system was not placed in service in 1976. As of 1977, only 21 miles had been constructed; as of 1979, 32 miles. [26] As of June 1, 1980, the system carried 12 channels. *329 Although BHA never executed an acceptance certificate with respect to the system, in a memorandum dated November 10, 1977, Siegal represented to the limited partners that the system was fully constructed. [27] Siegal became aware that the 60-mile system had not been constructed sometime in 1978. Siegal never tried to collect on the construction bond or to negotiate a reduction in the consideration payable to BFM. As is readily ascertainable from City maps, it was and is physically impossible to build 60 miles of cable within the area covered by the franchise. The largest system that could be constructed within the franchise area would be between 36-40 miles. Furthermore, there have never been 8,500 homes in the area covered by the system. The 1970 census indicates that there were 5,560 housing units located in the City. Barring any economic decline, the maximum number of homes that could have been passed (i.e., possible customers) by the system during the years at *330 issue was approximately 4,500. [28] As of 1985, the system actually passed 3,675 homes. Siegal never visited the site of the system or verified the number of miles in the franchise area or the number of houses that could be passed. [29]
The actual number of subscribers to the system has been: Year
Number of Subscribers
1977
118
1978
681
1979
1,323
1985
1,710
BHA kept no formal books and records. The partnership maintained checking accounts at Manufacturer's Hanover Trust Company and at Hartford National Bank & Trust Company. The activity *331 in these accounts was as follows: Manufacturers Hanover Trust Account
Deposits: Date
Amount
9/21/76
$1,000
9/30/76
36,000
9/30/76
52,000
9/30/76
88,000
11/8/76
6,000
Checks: Date
Payee
Amount
9/22/76
BFM
$43,000
10/15/76
Richard D. Siegal
75,000
10/15/76
Howard Davis
10,150
10/15/76
Allan Cannon
10,646
10/15/76
Alron Communications
10,000
10/15/76
Harvey Krauss
11,000
10/28/76
Schneck, Alexander &
1,886
Todtman
11/4/76
Leonard Flomenhaft
11,120
11/5/76
Fred Konigsberg
450
11/8/76
Richard D. Siegal
6,000
11/29/76
Richard D. Siegal
3,000
Hartford National Bank Account
Initial deposit on 12/17/76 for $50.00 Deposit 12/27/76 for $548,000. Check to BFM 12/23/76 $548,000. [30]
*332 BCM incorporated in the spring of 1977, and BFM assigned to it BHA's purchase money note. Around that time, Siegal acquired an ownership interest in BCM. Subsequently, relations between Siegal, Pitassi, Isaacson and Galanis began to deteriorate. In April 1978, Phoenix Cable (Phoenix) acquired BFM's stock and caused BFM to change its name to Norwalk Cable Television Construction Company, Inc. (Norwalk). Isaacson and the Galanis Brothers Trust owned Phoenix: Isaacson was President and Galanis, Chairman of the Board. [31] Pitassi resigned as a director of BCM when Phoenix took over BFM. Siegal and Isaacson had a falling out. Siegal also discovered that, in 1973, Galanis was imprisoned for violating the anti-fraud provisions of the Federal securities laws, and that under the terms of the approximately 9-year probation related thereto, Galanis was prohibited from managing money. In 1978, Phoenix retained Arthur Andersen & Co. to conduct an examination of the books and records of the CATV management companies in which Phoenix had an interest, including BCM. As *333 a result of this examination, Arthur Andersen determined that the disposition of certain advance payments made by the partnership to BCM was questionable. Also, in 1978, Siegal resigned as a director of BCM. As of September 27, 1979, [32] NIRREP (a successor to BFM), Phoenix, North Country, and others, entered into a joint venture with National Telecommunications, Inc. (National), a subsidiary of Acton CATV, Inc. (Acton). Galanis was the primary negotiator for Phoenix; Sam Phillips and George Phillips for Acton. Pursuant to the agreement, National was to succeed to the rights of the other parties regarding 40 to 45 BFM promoted cable television partnerships. A schedule in the agreement indicates that National allocated the BHA franchise $60,750 or 2.7 percent of the total amount ($2,250,000) it allocated to the 41 partnership franchises included. Also pursuant to the agreement, NIRREP attempted to arrange for each of the limited partnerships to enter into separate joint venture agreements with National. *334 BHA entered into such joint venture agreement. The purpose of the joint venture was to fully exploit the franchise; the venture was to continue for 15 years. The profits and any ITC on new assets were to be allocated 80 percent to National and 20 percent to BHA -- the losses were to be allocated 99 percent to BHA and 1 percent to National. The revenues were to be applied to (in the following order): the expenses and liabilities of the joint venture, interest on funds advanced by National and new construction or capital or capital improvement loans made or generated by National, principal of such loans, principal and interest due and owing on BHA's promissory notes to NIRREP and North Country, remainder - 80 percent to National; 20 percent to BHA. Under the terms of the joint venture, National was to acquire its interest in the system subject to the management agreement, warranty, surety agreement (construction bond), guaranty agreement, non-competition agreement, promotion and advertising agreement, and construction agreement. National agreed to forbear from collection on the construction note and any other promissory notes issued by BHA. The joint venture agreement also stated *335 that 32 miles had been completed in the system, that 8 miles had yet to be constructed, and that the system passed 6,000 homes. The system also was represented to have 681 basic subscribers, no-pay subscribers, and 135 additional outlets. The joint venture agreement further provided that 7 years from the date BHA was formed, National must offer to purchase BHA's assets and its interests in the joint venture, at its then fair market value. The Agreement Regarding the Joint Venture
Siegal negotiated with George Phillips (Phillips) for the sale of the remainder of BHA's interest to Acton. [33] On January 24, 1984, BHA entered into an "Agreement Regarding Joint Venture" with Acton. In exchange for its remaining interest in the system, BHA received: $25,000 (cash); a promissory note payable January 1, 2001, in the amount of $1,000,000 including imputed interest at 9 percent per annum; warrants to purchase 10,000 shares of Acton stock at $20 per share; and Acton's forgiveness of the Partnership's obligation to pay all amounts due on the nonrecourse construction note. [34]
*336 Siegal felt that it was in the best interest of the partnership to sell the system because, at the time of sale, (1) Acton was financially strapped; (2) enough time had passed such that some of the major tax benefits stayed with the partnership; and (3) that it was time for the deal, with all of its complications, to end. BHA reported the sale on its 1984 Partnership tax return as follows: Total
Franchise *
Equipment
83.64%
16.36%
Sale Proceeds
Cash
25,000
10,000
Warrants
7,500
value -
$ .75
$1M
Note
due
1/1/2001
w/interest ** 231,073
Debts Assumed *** 910,000
548,000
Total
Sales Price
1,721,573
1,440,000
281,573
Cost of Sale: Equip - orig.
cost 990K
acc'd dep
839,059
150,941
150,941
Franchise
Cost
25,000
25,000
Legal Fees
5,000
4,182
818
Total Costs
180,941
29,182
151,759
Gain on Sale
1,540,632
1,410,818
129,814
*337 The Tax Results as Reported
BHA filed Partnership Forms 1065Ks with the Internal Revenue Service for its taxable years 1976 through 1984. BHA used the cash receipts and disbursements method of accounting. The following table summarizes the items as reported: Taxable Year *
Item
1976
1977
1978
1979
1980
Gross
Receipts
$10,000
$50,000
$60,000
$0   $0   Deprecia-
tion ***
23,571
276,123
197,230
140,879
100,628
Interest
28,000
119,156
130,119
7,000
7,000
Subscriber
Connection
Fee
164,000
Promotion
and
Advertising
100,000
50,000
Prof. Fees
10,646
Consulting
10,000
Admin. Exp.
35,000
Non. Comp.
4,167
50,000
45,833
Contact
Labor
28,500
Vehicle Exp.
6,500
Utilities
400
Insurance
13,200
Office Exp.
2,000
1,000
798
Telephone
1,800
T & E
9,600
Organ. Amt.
4,697
4,697
4,697
4,697
Warranty
99,000
Maintenance
Fee
90,000
Total
-427,384
-549,976
-408,677
-152,576
-112,325
Taxable Year *
Item
1981
1982
1983
1984
Gross
Receipts
$0   $0   $0    ** $149,247
Deprecia-
tion ***
100,628
100,628
50,313
Interest
7,000
7,000
7,000
Subscriber
Connection
Fee
Promotion
and
Advertising
Prof. Fees
19,500
Consulting
Admin. Exp.
Non. Comp.
Contact
Labor
Vehicle Exp.
Utilities
Insurance
Office Exp.
2,675
Telephone
T & E
Organ. Amt.
4,698
Warranty
Maintenance
Fee
Total
-112,326
-107,628
-50,313 **** 120,072
*338 BHA claimed an ITC for property with a useful life of 7 or more years in the amount of $99,000 in 1976. Eileen became aware of the possibility of becoming a limited partner in BHA through Samuel Keller, her accountant, who is also a limited partner in BHA. [35] She reviewed the offering materials before investing in the partnership, and discussed the investment with her husband, who had some knowledge of the communications industry. [36]
*339 In 1976, Eileen acquired a 4.45 percent interest in BHA. Her required contribution was $25,000 of which she paid $8,000 by personal check, dated September 8, 1976, to BHA and $17,000 by a series of 10 notes payable to BFM. Petitioners reported items of loss and credit from BHA as follows: Year
Losses
ITC
1976
19,022
4,406
1977
24,274
1979
6,789
OPINION We must determine whether petitioners properly claimed as deductions their distributive share of the losses claimed by BHA; whether petitioners are entitled to an ITC associated therewith; and whether the transaction at hand was tax motivated such that the increased rate of interest under section 6621(c) is required. Petitioners contend that we should posit our decision on the transaction as it was proposed and not take into account the transaction as it actually occurred. They vigorously maintain that: (1) they made their investment in the context of a realistic evaluation that the transaction had economic substance quite apart from the anticipated tax benefits and (2) the later developments which significantly impaired the viability of the transaction could not reasonably have been anticipated *340 and therefore should not deprive them of those tax benefits. Respondent, on the other hand, urges us to evaluate the transaction as it actually occurred and hold that economic substance, apart from the tax benefits, was totally lacking with the result that petitioners should not be allowed the claimed tax benefits. In point of fact, respondent advances several grounds of attack. However, we are satisfied that the instant case can be disposed of within the economic substance context, and that consequently, we need not deal with every contention by respondent. It is well settled that, where a transaction is entered into without any purpose other than to obtain tax benefits, the form of the transaction will be disregarded and the tax benefits denied. Law v. Commissioner,86 T.C. 1065, 1093 (1986); Estate of Thomas v. Commissioner,84 T.C. 412, 432-433 (1985). It is equally well settled that a transaction that has no economic or commercial objective to support it is without effect for Federal income tax purposes. Frank Lyon Co. v. United States,435 U.S. 561 (1978); *341 Knetsch v. United States,364 U.S. 361, 366 (1960). The transaction must have economic substance which is "compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached." Frank Lyon Co. v. United States,supra at 583-584; Estate of Thomas v. Commissioner,supra;Hilton v. Commissioner,74 T.C. 305 (1980), affd. per curiam 671 F.2d 316 (9th Cir. 1982). As a threshold matter, a reasonable opportunity for economic profit exclusive of tax benefits must exist before a transaction will be recognized for tax purposes. Gefen v. Commissioner,87 T.C. 1471, 1490-1492 (1986); Estate of Thomas v. Commissioner,supra at 438; Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184, 203 n.17 (1983), affd. on this issue 752 F.2d 89 (4th Cir. 1985). [37]
*342 In determining whether the transaction at hand lacks economic substance, the focus is on the entire transaction. [38]If an objective analysis of the investment indicates a realistic opportunity for economic profit which would justify the form of the transaction, it will not be found to lack economic substance, even though subsequent developments which could not have been reasonably anticipated prevent the implementation of that opportunity. [39] See Gefen v. Commissioner,supra at 1490-1492; Estate of Baron v. Commissioner,798 F.2d 65 (2d Cir. 1986), affg. 83 T.C. 542 (1984). *343 The form of the transactions occurred as the private offering memorandum represented: BHA "purchased" a franchise from BFM; BFM and its affiliates financed and constructed the system; BCM managed the system; and BHA stood to realize 60 percent of any gain on "resale" of the system. Respondent argues, however, that in substance BHA acquired no economic interest in the system but merely purchased tax benefits from BFM and affiliates. Petitioners counter that BHA purchased the franchise and system, and that, in effect, BFM prevented the partnership from realizing its justifiably anticipated profits. Comparing the reality of the transaction to the documentation consistently followed by petitioners leads to the inescapable conclusion that no realistic possibility for an economic profit ever existed. Petitioners' documentation was based on a 60-mile system that would pass 8,500 homes. Under the best case scenario, however, the maximum potential of the system built would have been 40 miles and the system would have passed 4,500 homes. [40] Accordingly, the transaction as structured included inflated nonrecourse notes, which would have to be paid off, before BHA would realize any *344 profit. [41] The $910,000 construction note was inflated by at least $330,000; the notes from North Country by $257,882. [42] Therefore, the system would have to appreciate by at least $587,882 before the nonrecourse notes would be paid. [43] The nonrecourse note proceeds, of course, would inure to BFM and North Country or any of their assignees, not to BHA. *345 Additionally, many of the projected expenditures to acquire intangible assets were, in reality, merely fees to BFM or affiliates, which were of little or no value to BHA, e.g., noncompetition fees, warranty fees, promotion and advertising fees (see Appendix B). Accordingly, the system would have to appreciate such that these costs would be recouped as well. We must now determine whether there was any realistic possibility that the system would appreciate so that BHA would realize an economic profit. [44] We note at the outset, that under the agreements, 40 percent of any profit from resale would inure to Siegal; the limited partners would have been entitled only to 60 percent of any profit on resale. There was no data in the *346 private offering memorandum on potential appreciation of the system or speculation on the amount of gain if the system were sold. The memorandum did include a purchase option (exclusive of equipment) at fair market value (but no less than $1,786,000), that BCM could exercise between January 1, 1983, and January 1, 1985. [45] The memorandum did not include any projections for the residual value of the equipment to be kept by the partnership, in the event the purchase option was exercised. The only mention of appreciation of the system was in the Alron report, in which Scheinman estimated $400 per subscriber as a possible future sales price. [46] There is no indication that Scheinman's sales figure was exclusive of equipment. In *347 1982, with a revised number of estimated subscribers of 2,364, this indicates a worth of $945,600. [47] However, in 1982, the partnership would still owe $670,000 on the construction note and $548,000 on those of North Country. Accordingly, assuming this prediction were correct, the system would still have to be sold at a loss. [48] On these facts, we are certain that there was no realistic objective possibility for BHA to make an economic profit. Under the best case scenario, BHA could have expected $93,322 of cash flow, $945,600 representing the value of the system (perhaps somewhat more if Scheinman's figure of $400 per subscriber as applied to the 2,364 revised estimated subscribers were low), and perhaps some residual value from the equipment. It is clear that, in order to exceed the amount of obligations of BHA and the cash investments of the partners, the residual value of the equipment would have to have appreciated to a value of $730,680 -- a figure far in excess of the $580,000 revised construction cost of a 40-mile system (see p. 36, supra). [49] The foregoing economic profit analysis stands in sharp contrast to the projected net tax benefits of $870,491 [50] to taxpayers *348 in the 50-percent bracket. *349 Petitioners seek to avoid the consequences of the foregoing analysis by placing the blame for the failure of the system to live up to expectations on the mismanagement of BFM and its affiliates. Their claim rests on the proposition that this mismanagement was unforeseen and accordingly, that they should not be deprived of their expected tax benefits. See Gefen v. Commissioner,supra at 1492. We disagree. Granted that "tax consequences cannot depend on unrealistic demands for certainty" (87 T.C. at 1492), they must at least depend upon realistic possibilities. As the promoter and general partner of BHA, Siegal bore the responsibility for constructing a transaction that would withstand attack and petitioners' tax position depends upon an evaluation of his actions or inaction (see p. 43, infra). [51] In our opinion, Siegal failed to provide the minimum level of investigation and analysis which could reasonably have been expected of him. *350 In 1976, Siegal had no experience and little knowledge about the cable television industry. [52] His expertise was in business and law, mostly tax law. He relied on the representations made by BFM and its affiliates without checking the premises on which the investment was based. See Estate of Baron v. Commissioner,83 T.C. at 556; Patin v. Commissioner, 88 T.C.     (April 29, 1987).
Jack Scheinman of Alron Communications was the only allegedly "independent" consultant Siegal hired to prepare an appraisal report of the system to be constructed. *351 We use the world "allegedly" advisedly because Scheinman was Alron's only employee [53] and apparently, BFM and its affiliates subsequently became Alron's only clients. [54]
Scheinman submitted a 3-page favorable report, dated September 20, 1976, only two days prior to the closing. There is no evidence that Scheinman made any investigation of the geographic or physical limitations on the proposed system. Indeed, we are not satisfied that he even visited the City prior to preparing the report. His report simply assumed that 8,500 homes were to be passed and 60 miles of plant were to be constructed in the contemplated system; stated that the construction price [$990,000] for the system was high but acceptable; and that, when the projected subscriber and revenue was reached, $400 as a basis for sales price was within the lower ranges *352 estimated by experts. The report did not contain any projections of revenues, income, expenses, or profits, nor did it state the basis for its conclusions. Additionally, Siegal testified that he did not rely on the sales price figure given in Scheinman's report. Besides not checking the premises on which the investment was based, Siegal did not know, and apparently made no effort to investigate, the reputations of many of the principals involved. Although Siegal recognized and generally respected Pitassi from prior business dealings, he did not know Pitassi's background, if any, in the cable television industry. Additionally, Siegal failed to discover, until long after the deal closed, that Galanis had been convicted of a violation of the securities law and (during the years in issue) was forbidden to handle money. Moreover, Siegal was seemingly unconcerned about the extent of Isaacson's difficulties with the SEC, since there is no evidence that he checked on the nature or severity of Isaacson's violation after Isaacson put Siegal on notice of such problem. Apparently, Siegal did not know about industry practices or question why the many of the agreements deviated therefrom. *353 For example, the compensation arrangement in the management agreement varied from the industry norm, as did the fact that the seller of the franchise was going to have an integral continuing relationship with the buyer. Additionally, the noncompetition agreement was unusual under the circumstances, as was the warranty agreement. The projections themselves were based on a 7-year rather than a 10-year basis, which is the usual period for projections in the cable television field, [55] and many of the numbers were in error or unclear. See, for example, the notes to the attached appendices. Additionally, as petitioner's expert Martin Smith testified, the agreements were ambiguous as to whether BHA was to receive 10 percent of all revenues when revenues exceeded $250,000 or 10 percent of revenues in excess of $250,000. The accuracy of projected revenues to be received by BHA would be vital in determining viability and profitability. In short, it is clear that Siegal was far more interested in the tax benefits to be derived from the transaction *354 and acted accordingly. In fact, he testified that it would have been prudent to invest in these transactions for the tax benefits alone. [56] A careful review of the record indicates that he did just that. [57] The most that can be said is that, at the time of entering the transaction, Siegal's behavior reflected a clear indifference to its business success or failure. See Estate of Baron v. Commissioner,supra at 560; Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1245 (1981). Or to put it another way, Siegal's actions "merely reflect concern with establishing a plausible pretext for tax benefits rather than evidencing bona fide attempts * * * at a profit seeking activity." See Patin v. Commissioner,supra (slip opinion at 46). *355 We recognize that our observations in regard to Siegal's attitude go more to the existence of a profit motive than to the presence or absence of economic substance. But there is an overlap between these two prongs of analysis, see Rose v. Commissioner,88 T.C. 386 (1987), so that our observations are clearly relevant to our decision herein. See also Patin v. Commissioner,supra (slip opinion at 46-48). In this connection, we are not unaware of the proposition that where a taxpayer mistakenly believes there existed a potential for profit, a transaction devoid of economic substance may not be disregarded entirely (sometimes called the subjective business purpose test). See Rice's Toyota World, Inc. v. Commissioner,81 T.C. at 203 n.17. Under the circumstances of this case, however, Siegal should have known that the transaction at issue could not achieve a non-tax profit. Compare Siegel v. Commissioner,78 T.C. 659 (1982); Brannen v. Commissioner,78 T.C. 471 (1982), affd. 722 F.2d 695 (11th Cir. 1984). We refuse to allow a sophisticated businessman who has not taken adequate steps to *356 form a reasoned assessment of an investment to rely on his failure to take such steps and on his resulting ignorance. Compare Patin v. Commissioner,supra (slip opinion at 48). To do so would encourage "tax shelter charlatans," [58] and discourage taxpayers from independently evaluating transactions and making informed business judgments, thereby putting a premium on gullibility. See James v. Commissioner,87 T.C. 905, 924 n.5 (1986). Other indicia of whether a transaction has economic substance are the presence or absence of arm's-length price negotiations, the relationship between the sales price and fair market value, the structure *357 of the financing of the transaction, and the degree of adherence to contractual terms. Rose v. Commissioner,supra at 412. No one disputes that the agreements used were form agreements, [59] that there were no price negotiations in the initial transactions [60] or that the parties here are interrelated. Again, although the parties do not agree on the fair market value of the system, petitioners acknowledge that, based on the system as actually completed, the sales price was grossly inflated. [61]
We are not impressed with petitioners' argument that their position should be sustained because of the claimed low projected ratio of tax benefits to investment. The presence of a low ratio has no *358 independent significance and cannot overcome the impact of other criteria by which tax-motivated transactions are determined. [62] Nor are we disposed to recast the transaction and allow petitioners depreciation and the investment tax credit based on the $488,596 value placed on the equipment by respondent's expert witness and alternatively accepted on brief by petitioner. See note 61, supra. The fact of the matter is that BHA acquired the equipment in a transaction that inherently was without economic substance, and under these circumstances no depreciation or investment tax credit is allowable herein. On the same basis, petitioners are not entitled to any deductions for up-front payments purportedly paid by BHA [63] such as warranty fee, noncompetition fees, fees of the general partner, etc. Finally, we must deny petitioners' claimed interest expense deductions on the nonrecourse notes involved herein because petitioners have failed to substantiate that such interest was, in fact, paid. [64] See Rose v. Commissioner,supra at 422-424. *359 Respondent also contends that the increased rate of interest under section 6621(c) applies, because (1) the transaction involved a "valuation overstatement" as defined by section 6621(c)(3)(A)(i), and (2) BHA's entry into the transactions at issue were motivated by a desire to achieve tax savings rather than a desire for economic profit. [65] Petitioners, of course, contend otherwise. Under section 6659(c), if the adjusted basis of any property claimed on any return is 150 percent or more of the amount determined to be the correct adjusted basis, a valuation overstatement exists. Because we have found that the transaction is devoid of economic substance and is to be disregarded for tax purposes, petitioners have a zero adjusted basis for depreciation or ITC purposes. See Zirker v. Commissioner,87 T.C. 970, 978 (1986). Accordingly, respondent is entitled to *360 additional interest under section 6621(c) after December 31, 1984, on the portion of the deficiency for each year resulting from disallowed depreciation and ITC. See Patin v. Commissioner,supra (slip opinion at 60-63); Solowiejczyk v. Commissioner,85 T.C. 552, 555 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Miscellaneous deductions claimed by petitioners were also disallowed because they related to a transaction without economic substance. Because the evidence is overwhelming that the miscellaneous deductions in issue were "tax motivated," we conclude that respondent is entitled to additional interest after December 31, 1984, on the portion of the deficiency attributable to the disallowed miscellaneous deductions. [66] See sec. 301-6621-2T, A-4(1) and (2), Proced. & Admin. Regs. (Temporary), 49 Fed. Reg. 50390, 50394 (Dec. 28, 1984).
Decisions will be entered under *361 Rule 155.
APPENDIX A BENTON HARBOR
ESTIMATED REVENUES AND EXPENSES OF CATV SYSTEM
YEAR
1977
1978
1979
1980
1981
1982
NO. OF SUBSCRIBERS
(Average)
1062 1931
3219
3502
3979
4465
REVENUES
Subscription
revenues
101,952 185,376
309,024
336,192
381,984
428,640
Pay Television
30,585 55,612
92,707
100,857
114,595
128,592
TOTAL REVENUE
132,537 240,988
401,731
437,049
496,579
557,232
EXPENSES
System Fee *
50,000 60,000 ** 225,173
228,704 *** 235,649
240,723
Salaries
33,500 35,175
36,934
38,780
40,719
42,755
Vehicles
4,800 5,040
5,292
5,557
5,834
6,126
System Maintenance
3,500 3,675
3,859
4,052
4,254
4,467
Microwave
14,400 15,120
15,876
16,670
17,503
18,378
Pole Rental
12,000 12,000
12,000
12,000
12,000
12,000
Utilities
5,000 5,250
5,512
5,788
6,078
6,381
Insurance
4,000 4,200
4,410
4,630
4,862
5,105
Office Rent &
Supplies
4,500 4,725
4,961
5,209
5,470
5,743
Billings & Postage
2,655 4,827
7,585
8,755
9,947
11,162
Telephone
2,500 2,625
2,756
2,894
3,039
3,191
Travel &
Entertainment
1,000 1,050
1,102
1,158
1,216
1,276
Advertising
20,000
20,000
20,000
20,000
20,000
Pay Television
15,293 27,806
46,353
50,429
57,298
64,296
Miscellaneous
3,000 3,150
3,308
3,473
3,647
3,829
TOTAL EXPENSES
156,148 204,643 **** 395,121
408,099 **** 427,516
445,432
NET OPERATING INCOME
(23,611)
36,345 **** 6,610
28,950 **** 69,063
111,800
*362 APPENDIX B BENTON HARBOR
ESTIMATED REVENUES AND EXPENSES
PARTNERS
1976
1977
1978
1979
REVENUE
Income - Fixed Payments
10,000 50,000 60,000 175,000 Income - Override *
40,173 Sale of System
TOTAL REVENUE
10,000 50,000 60,000 215,173 EXPENSES
Standby Loan Fee
42,000 Professional & Consulting Fees
23,000 Guaranteed Payment
90,000 Warranty Fee
99,000 Non-Competition Fee
4,167 50,000 45,833 Promotion and
Advertising
100,000 50,000 Operating Costs
220,000 1,000 3,500 3,500 Loan Interest
28,000 112,156 123,119  *** 151,719 Depreciation
24,000 283,000 202,000 127,000 Maintenance Fee
90,000 TOTAL EXPENSES
531,167 595,156 464,452 282,219 NET PROFIT (LOSS)
(521,167)
(545,156)
(404,452)
(67,046)
INVESTMENT TAX CREDIT
99,000 CASH INPUT - Limited Partners
176,000  ** 176,000  ** 132,000  ** 66,000 CASH INPUT - General Partner
1,000 *363 BENTON HARBOR
ESTIMATED REVENUES AND EXPENSES
PARTNERS
1980
1981
1982
1983
REVENUE
Income - Fixed Payments
185,000 185,000 185,000
Income - Override *
43,704  **** 50,649 55,723
Sale of System
TOTAL REVENUE
228,704 235,649 240,723
EXPENSES
Standby Loan Fee
Professional & Consulting Fees
Guaranteed Payment
Warranty Fee
Non-Competition Fee
Promotion and
Advertising
Operating Costs
3,500 3,500 3,500
Loan Interest
112,319 106,919 101,519
Depreciation
127,000 126,000 126,000
Maintenance Fee
TOTAL EXPENSES
242,819 236,419  ***** 231,000
NET PROFIT (LOSS)
(14,115)
(770) ***** 9,723
INVESTMENT TAX CREDIT
CASH INPUT - Limited Partners
CASH INPUT - General Partner
*364 APPENDIX C BENTON HARBOR
ESTIMATED SOURCE AND APPLICATION OF FUNDS
PARTNERS
1976
1977
1978
1979
SOURCE OF FUNDS
Partner's Capitals
551,000
Operation - Fix Payments
10,000
50,000
60,000
175,000
Operation - Override
40,173
Mortgages
910,000
Loans
178,000
212,156
156,619
1,649,000
262,156
216,619
215,173
USE OF FUNDS
Standby Loan Fees
42,000
Organizational Costs
48,000
Guaranteed Payment
90,000
Acquisition of Franchise
25,000
Warranty Fee
99,000
Non-Competition Fee
100,000
Promotion and Advertising
100,000
50,000
Loan Interest
28,000
112,156
123,119
117,719
Loan Principal
60,000
System Construction
990,000
Maintenance Fee
90,000
Operating Costs
220,000
1,000
3,500
3,500
Insurance
6,000
1,649,000
262,156
216,619
181,219
NET CASH FLOW
33,954
BENTON HARBOR
ESTIMATED SOURCE AND APPLICATION OF FUNDS
PARTNERS
1980
1981
1982
SOURCE OF FUNDS
Partner's Capitals
Operation - Fix Payments
185,000
185,000
185,000
Operation - Override
43,704
* 50,649
55,723
Mortgages
Loans
228,704
235,649
240,723
USE OF FUNDS
Standby Loan Fees
Organizational Costs
Guaranteed Payment
Acquisition of Franchise
Warranty Fee
Non-Competition Fee
Promotion and Advertising
Loan Interest
112,319
106,919
101,519
Loan Principal
60,000
60,000
60,000
System Construction
Maintenance Fee
Operating Costs
3,500
3,500
3,500
Insurance
175,819
170,419
165,019
NET CASH FLOW
52,885
65,230
75,704
*365 APPENDIX D ESTIMATED INCOME OR (LOSS)
CABLE TELEVISION SYSTEM
BENTON HARBOR, MICHIGAN
1976
1977
1978
Taxable Income or (Loss)
$ (424,167)
$ (568,156)
$ (427,452)
Anticipated Cash Flow
Investment Tax Credit
99,000 Inventor Input - [sic]
Limited Partners
176,000 176,000 132,000 Investor (1 Unit) *
Taxable Income or (Loss)
(18,895)
(25,309)
(19,041)
Anticipated Cash Flow
Investment Tax Credit
4,410 Investor Input
8,000 8,000 6,000 Ratio of Write-off to Investor
Input (Includes Investment
Tax Credit X 2 in 1976 and
Cash Flow X 2 in 1979)
3.46  3.16  3.17  ESTIMATED INCOME OR (LOSS)
CABLE TELEVISION SYSTEM
BENTON HARBOR, MICHIGAN
1979
1980
1981
1982
Taxable Income or (Loss)
$ (90,046)
$ (37,115)
$ (23,770)
$2,723
Anticipated Cash Flow
33,954 52,885 65,230 75,704
Investment Tax Credit
Inventor Input - [sic]
Limited Partners
66,000 Investor (1 Unit) *
Taxable Income or (Loss)
(4,011)
(1,653)
(1,059)
121
Anticipated Cash Flow
1,512 2,356 2,905 3,372
Investment Tax Credit
Investor Input
3,000 Ratio of Write-off to Investor
Input (Includes Investment
Tax Credit X 2 in 1976 and
Cash Flow X 2 in 1979)
2.35 *366 APPENDIX E CALCULATIONS USED IN "REVISED ESTIMATED SOURCE AND APPLICATION OF FUNDS" STATEMENT (APPENDIX F) The private offering memorandum projected cash flow to BHA as follows: 1976
0
1977
0
1978
0
1979
$33,954
1980
52,885
1981
65,230
1982
75,704
Total
$227,773
These cash flow projections, however, are unrealistic because they are tied to projected revenues which are based on unrealistic numbers of subscribers. Accordingly, we have computed realistic projected cash flow figures, using the same varying penetration ratios assumed in the private offering memorandum, but based on the feasible number of homes passed (4,500) rather than the projected (8,500). The following table summarizes realistic potential subscriber figures for the years 1977-1982: Penetration Ratio
Revised
(As derived from the memorandum)
Number of Subscribers
1977
.1249411 (1062/8500)
562 (.1249411 X 4500)
1978
.2271764 (1931/8500)
1022 (.2271764 X 4500)
1979
.3785882 (3218/8500)
1704 (.3787058 X 4500)
1980
.412000 (3502/8500)
1854 (.412000 X 4500) 1981
.4681176 (3979/8500)
2107 (.4681176 X 4500)
1982
.5252941 (4465/8500)
2364 (.5252941 X 4500)
*367 The private offering memorandum CATV system projected revenues apparently were based on $8 per month fees, and pay television as a .29999 constant of subscription revenues. Using the revised subscriber number estimates yields projected revenues for the CATV system as follows: Subscription Revenues
Pay Television
Total
1977
53,952(8X12X562)
16,185(53952X.29999)
70,137
1978
98,112(8X12X1022)
29,433(98112X.29999)
127,545
1979
163,584(8X12X1704)
49,074(163584X.29999)
212,658
1980
177,984(8X12X1854)
53,393(177984X.29999)
231,377
1981
202,272(8X12X2107)
60,680(202272X.29999)
262,952
1982
226,944(8X12X2364)
68,081(226944X.29999)
295,025
Accordingly, the guaranteed payments to BHA would be: Income
Fixed Payment
Override
Total
1976
10,000
0
10,000
1977
50,000
0
50,000
1978
60,000
0
60,000
1979
175,000
0
175,000
1980
185,000
0
185,000
1981
185,000
26,295(10%X262952)
211,295
1982
185,000
29,503(10%X295025)
214,503
We have revised the Estimated Source and Application of Funds projections for the partnership to reflect the changed payments, and accordingly, *368 the projected net cash flow for the years 1976-1982 is $93,322 (see Appendix F). We have not reduced any of the Uses of Funds on the revised projections because there is no indication that any of the parties involved reduced the amounts projected or expended to accord with the reality of the transaction. In any event, we doubt whether many or all of these projected uses (other than system construction fees) have value. APPENDIX F BENTON HARBOR
REVISED ESTIMATED SOURCE AND APPLICATION OF FUNDS
PARTNERS
1976
1977
1978
1979
SOURCE OF FUNDS
Partners' Capital
551,000
Operation - Fix Payments
10,000
50,000
60,000
175,000
Operation - Override
0
Mortgages
910,000
Loans
178,000
212,156
156,619
1,649,000
262,156
216,619
175,000
USE OF FUNDS
Standby Loan Fees
42,000
Organizational Costs
48,000
Guaranteed Payment
90,000
Acquisition of Franchise
25,000
Warranty Fee
99,000
Non-Competition Fee
100,000
Promotion and Advertising
100,000
50,000
Loan Interest
28,000
112,156
123,119
117,719
Loan Principal
60,000
System Construction
990,000
Maintenance Fee
90,000
Operating Costs
220,000
1,000
3,500
3,500
Insurance
6,000
1,649,000
262,156
216,619
181,219
NET CASH FLOW
(6219)
*369 BENTON HARBOR
REVISED ESTIMATED SOURCE AND APPLICATION OF FUNDS
PARTNERS
1980
1981
1982
SOURCE OF FUNDS
Partners' Capital
Operation - Fix Payments
185,000
185,000
185,000
Operation - Override
0
26,295
29,503
Mortgages
Loans
185,000
211,295
214,503
USE OF FUNDS
Standby Loan Fees
Organizational Costs
Guaranteed Payment
Acquisition of Franchise
Warranty Fee
Non-Competition Fee
Promotion and Advertising
Loan Interest
112,319
106,919
101,519
Loan Principal
60,000
60,000
60,000
System Construction
Maintenance Fee
Operating Costs
3,500
3,500
3,500
Insurance
175,819
170,419
165,019
NET CASH FLOW
9,181
40,876
49,484
APPENDIX G The following table summarizes the gains/losses as projected in the private offering memorandum and as actually reported on the tax returns. From these figures, we have calculated the tax benefits to taxpayers in the 50-percent bracket. Actual Gains/Losses and ITC
Projected
Long-Term
Gains/Losses and ITC
Capital Gain
Gains/Losses
ITC*
Gains/Losses
ITC
(LTCG)
1976
($521,167)
$99,000
($427,384)
$99,000
1977
($545,156)
($549,976)
1978
($404,452)
($408,677)
1979
($67,046)
($152,576)
1980
($14,115)
($112,325)
1981
($770)
($112,326)
1982
$9,723 ($107,628)
1983
($50,313)
1984
$120,072 $1,410,818
Total
gains/
losses
($1,542,983)
($1,801,133)
Adjusted
40% of
for LTCG
$564,327.20 $1,410,818
Net Gains/
($1,542,983)
($1,236,805.80)
Losses
Benefit
to T/P
at 50%
Bracket
($771,491.50)
($618,402.90)
Adjusted
for
Claimed
ITC
($870,491.50)
($717,402.90)
*370 Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Subsec. (d) of sec. 6621↩ was redesignated subsec. (c) and amended by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1511(c)(1)(A)-(C), 100 Stat. 2744. We use the reference to the Internal Revenue Code as redesignated and amended.
2. Benton Harbor is located in southwestern Michigan, approximately 165 miles west of Detroit. ↩
3. The agreement further provided that the franchise could not be sold, leased, transferred or otherwise disposed of without prior consent of the City, and that the City could renew the franchise agreement every 5 years. BHCT, Inc., in turn, agreed, inter alia, to operate and maintain a cable television studio facility for the City and to provide a television camera and channel to the City without cost; to provide one channel on its system for City schools; to provide a channel alerting system for emergencies; and to provide, free of charge, one connection to all City buildings and schools within the City.↩
4. The City records reflect some confusion as to the effect of the stock transfer. On October 18, 1976, the City Commission passed a resolution authorizing BHA to act as licensee of BHCT, Inc. On October 3, 1977, the City Commission passed another resolution approving the sale of the franchise by BHCT, Inc. to BHA. That resolution states: Earlier this year, a firm called "Benton Harbor Associates" purchased the franchise from the former owners, however, without receiving City approval. The new owners must have this contract approved in order to proceed with hook-up in the City * * * THEREFORE, BE IT RESOLVED, that the City Commission of the City of Benton Harbor hereby approves of the sale and transfer of the City's Cable TV franchise by Benton Harbor Cable TV Incorporated to Benton Harbor Associates * * *.↩
5. Isaacson had a SEC violation that would have had to have been disclosed had he become general partner.↩
6. Actually, Siegal had met Pitassi a couple of years earlier in an unrelated business deal. Siegal was involved in a public offering with respect to a company with which Pitassi was president. That public offering passed due diligence requirement. Siegal had no knowledge of Pitassi's background, if any, in cable television. There is some confusion whether Isaacson had previously met the people involved with BFM, or how committed Isaacson was to doing the deal before visiting BFM. Siegal testified that he and Isaacson met them for the first time together, and also that Isaacson introduced Siegal to the people. ↩
7. Siegal lacked expertise in the cable television industry, but did not view the role of general partner as in need of such expertise: Q: Did you feel that you were -- believe that you were expert enough in cable television to make the judgments yourself, as general partner? A: No. I didn't view that the general partner needed that. Since the nature of this transaction was financial, I felt I was certainly strong enough, financially, to understand the nature of the venture. The financing was fabulous. The contracts basically provided for cable people to do the cable work. B.F.M. was going to do the building and constructing. They had a track record. B.F.M. or a subsidiary of B.F.M. was going to manage the cable system, hire a few local people to sell it. I did not look at it as particularly esoteric business, but I also saw that it was being placed in the hands of others * * *.↩
8. I.e., investor's estimated annual taxable income some part of which will be subject to a Federal income tax rate of at least 50 percent or a net worth of at least $200,000, exclusive of home, home furnishings, and automobiles.↩
9. S.C. Orlicki, Inc., was owned by Samuel Rosengarten who was the general partner and promoter of several other BFM affiliated partnerships.↩
10. The memorandum also represented that BFM's current net worth (Sept. 1976) was in excess of $600,000.↩
11. The projections generally were calculated over a 7-year period. Normally, projections in the industry were calculated on a 10-year basis. ↩
12. The memorandum indicated, however, that neither of these services would be available immediately. It stated further that -- [t]here can be no assurance that Manager will be able to implement its intent to obtain Pay TV or Home Box Office subscribers either because of its inability to obtain programs necessary to make Pay TV or Home Box Office attractive to subscribers or for other reasons, in which event Manager and the Partnership would be adversely affected. * * *↩
13. Unspecified changes were made in the agreements between the time that Cannon reviewed them and the signing. Cannon testified that he was not apprised of any changes or asked to reassess his tax opinion accordingly.↩
14. The promissory note evidencing this agreement was to be held in escrow (and not released to BFM) until delivery of a certificate of completion. ↩
15. No payment of principal was ever made on the note.↩
16. An unsigned agreement between Jerrold, BFM and North Country provided that any indebtedness of BHA to BFM or North Country was to be subordinated to any indebtedness to Jerrold.↩
17. Subscription revenues were defined as gross revenues less installation revenues and municipal fees. ↩
18. A question exists whether BHA was to receive 10 percent of total revenues or 10 percent of revenues in excess of $250,000. The private offering memorandum and projections included therewith indicate the former; the management agreement itself is ambiguous.↩
19. The purchase option, as set forth in the management agreement, provided that BCM would have the right to purchase the system at any time between Jan. 1, 1983, and Jan. 1, 1985, at its fair market value (but not less than $1,786,000). In the event that BCM exercised its option to purchase the system, it had the further option of leasing the equipment included in the system, at its currently appraised fair rental value. The purchase price was to be paid by cancellation of the balance due on the construction note and the notes owed to North Country, 29 percent of the remaining portion was to be paid in cash, any remainder by nonrecourse note.↩
20. Upon 30 days' notice, but not before Sept. 22, 1977, BCM was to provide a certificate of performance to BHA showing that the advertising work had in fact been performed. ↩
21. Because the franchise covering the City was nonexclusive, there existed the possibility that a competing system could be built, thus resulting in an "overbuild" situation. The noncompetition agreement between BCM and BHA ostensibly was to deter BCM from becoming involved in such a system. ↩
22. According to a letter from BCM (Pitassi) to BHA, the $220,000 was to be expended: $164,000 as advanced cost for subscriber connections; $56,000 for other operational expenses.↩
23. The monies were to be paid to BHA as follows: Sept. 22, 1976 - $178,000; Jan. 2, 1977 - $213,000; Jan. 2, 1978 - $157,000.↩
24. A separate franchise existed for Benton Township, which was built by the Omega Associates venture. Arrow was hired to construct that system as well.↩
25. Roy Ingram was employed by Drake as a handyman. He was not an engineer.↩
26. A report from Acton to BHA, dated June 1, 1980, indicates that only 25.5 miles of cable had been constructed.↩
27. The construction note was released from escrow and given to BFM, around May 1977, after BFM's counsel wrote to BHA's counsel requesting that an acceptance certificate or an objection thereto be made by BHA.↩
28. Actually, an economic decline in the City occurred during the years at issue. Accordingly, the number of homes that the system could pass is even less.↩
29. Seigal testified that the number of houses was verified, but was not specific: Q: Did you verify that there were 8500 homes in that area? A: In some way or other, I did, or the attorneys did on my behalf. Q: What did you do to verify it? A: I don't know. He might have called the town and asked them what their population was. I don't know the physical act that was done, but I know a number like that would have been checked by somebody.↩
30. This amount would seem be the loan from North Country, due to be paid in 1976, 1977 and 1978, totaling $548,000. Only 1 promissory note in the amount of $178,000 is in evidence, however, and in the joint venture agreement between National Telecommunications, Inc. and Phoenix Cable (dated Sept. 27, 1979), BHA is listed as indebted to the amount of $218,000. Therefore, it is unclear whether or to what extent those funds were actually transferred.↩
31. Siegal had a retainer agreement with Galanis, and during the years at issue performed some legal work for him.↩
32. Some confusion exists as to the actual date of the joint venture agreement. In a letter dated Feb. 6, 1981, from Acton to BHA, Phillips refers to the joint venture agreement of Sept. 26, 1981.↩
33. George Phillips and his brother, Sam Phillips, were both heavily involved in Acton. At various times during the years at issue, each was President of Acton. ↩
34. Acton entered into similar agreements with 40 to 45 other BFM/Phoenix affiliated partnerships. Siegal negotiated the BHA agreement such that Acton paid substantially more to BHA than to other partnerships. At the time of trial, Acton was attempting to sell the system, as part of a package of 3 systems for $6,000,000. George Phillips testified that he attributed the sales price of the BHA system to be approximately 30 to 40 percent of the total.↩
*. The franchise was valued at $900 per subscriber multiplied by 1600 subscribers, resulting in a value of $1,440,000. The balance of the sales proceeds was allocated to the equipment. ** This note was secured by an annuity with BHA as owner. The annuity cost $143,964.27. *** BHA made no payments of principal on the note.↩
*. The parties' stipulations concerning the information summarized herein contain errors. This table reflects the information as actually reported on the tax returns. ** Income for 1984 was reported by the partnership as follows: Interest
$ 19,433
Ordinary Gain on
Sale of CATV Equipment
129,814
Total
$149,247
*** BHA used 150 percent double declining balance and a 7-year life. **** Plus $1,410,818 net long term capital gain reported by limited partners.↩
35. The financial projections for the transaction were prepared by Samuel Keller's firm from information supplied by Isaacson and [Illegible Line] ↩
36. It is unclear exactly what materials were included in the offering materials. Presumably Eileen reviewed the private offering memorandum and the tax opinion letter. A prepared statement detailing the tax consequences of the investment was found in her files, but it is unclear from the record exactly when Eileen first obtained access to this statement, although we are satisfied that she received it no later than the implementation of the escrow agreements on Sept. 30, 1976. This statement is Appendix D to this opinion.↩
37. In this regard, the transaction may still not be recognized for tax purposes if there is an impermissible disparity between such economic profit and the anticipated tax benefits. Estate of Baron v. Commissioner,83 T.C. 542, 557-558 (1984) affd. 798 F.2d 65 (2d Cir. 1986). See also Torres v. Commissioner, 88 T.C.     (March 30, 1987) (slip opinion at 43); Gilbert v. Commissioner,T.C. Memo. 1987-165↩.
38. See Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184, 197 (1983), affd. on this issue 752 F.2d 89↩ (4th Cir. 1985). 39. The record in this case, especially in respect of Siegal's post-acquisition efforts, does not support the conclusion that the transactions were "a mere paper chase or otherwise fictitious." See James v. Commissioner,87 T.C. 905, 918 (1986). Nevertheless, the transactions will be disregarded, if after applying the objective test, we find that they are devoid of economic substance, consonant with their intended tax effects. See Rose v. Commissioner,88 T.C. 386, 415↩ (1987).
40. We note that the actual system constructed was approximately 32 to 33 miles and passed roughly 3,675 homes. ↩
41. Additionally, it appears that BFM stood to make a large profit on the construction alone. The subcontractor estimated the construction cost of both this system and the system in Benton Harbor Township to be around $450,000. It is unclear whether this estimate was based on a 60-mile or a 40-mile system for the City. Additionally, there was no breakdown in the record as to the cost estimated for each system. ↩
42. The nonrecourse notes totaled $1,458,000 ($910,000 for the construction note; $548,000 for the notes from North Country). BHA paid additional construction costs of $80,000 in cash. Based on a 40-mile system and the fact that construction costs are generally based on mileage, the construction note should have been $580,000 ($990,000 X 40/60 - $80,000). Because the proceeds from the North Country notes were to be used for advertising, promotion, and other nonconstruction costs, we have reduced this amount by the potential number of subscribers rather than the mileage. This reduces the North Country notes to $290,118 ($548,000 X 4500/8500). We also note that it is questionable whether all of the loan proceeds from North Country were actually transferred to BHA. ↩
43. We note that the private offering memorandum projections indicated that in 1976, alone, $1,649,000 would be used for construction and start-up costs of the system.↩
44. Of course, any cash flow to BHA would be included in this analysis. The private offering memorandum projected net cash flow of $227,773 for the years 1976-1982. These projections are inaccurate, however, because they are based on inflated revenues. Using feasible subscriber projections for 1976-1982, a realistic adjusted net cash flow (assuming a 40-mile system passing 4,500 homes) for the years 1976-1982 is $93,322. See Appendices E and F.↩
45. No formula for computing the minimum option figure (which is the sole figure in the memorandum predicting potential appreciation of the system) is given. The memorandum, however, estimated the number of subscribers in 1982 at 4,465, and Scheinman in his report indicated that, in the future, the system might be worth $400 per subscriber. It would appear that the purchase option figure was arrived at accordingly, i.e., 4,465 X $400 per subscriber.↩
46. Various articles projecting cable television franchise values were admitted into evidence. We use Scheinman's figure in our calculations, without regard to the other figures, because the value in the Alron report was supposedly specifically computed with regard to this particular franchise. Furthermore, we note that Siegal did not consider any independent valuation. ↩
47. The estimated subscriber figure for 1982, 4,465, apparently was based on a 52.53491-percent penetration rate, i.e., 4465/8500. The estimated subscriber figure accurately reflecting the franchise area, for 1982, would have been 2,364, i.e., 4500 X .5253491. This results in an adjusted option price of $945,600. ↩
48. According to the agreements, it is doubtful that BHA could have sold the system in 1982, barring a breach by BCM or BFM. ↩
49. Although there is no indication in the Alron report that the projected value of $400 per subscriber was exclusive of the equipment, it may be reasonable to infer as much because of the apparent correlation between this figure and the purchase option in the private offering memorandum (which is exclusive of equipment). Even assuming that (1) the Alron report sales figure is exclusive of equipment, and that (2) in 1976, the equipment foreseeably possessed some residual value in 1982, we conclude that any realistic residual value of such equipment would be insufficient to affect our analysis. We base our conclusion on the following facts: (1) cable television equipment normally has a useful life of approximately 7 years, and in 1982, the equipment in question should have been in use for such time, and (2) in order for BHA to realize even $1 of economic profit, under these facts, the equipment would have had to appreciate such that its residual value exceeded its original value. There is no evidence in the record to support such potential appreciation. The fact of the matter is that BHA could expect to receive $945,600 in a hypothetical sale of the system and $93,322 cash flow during the operation. Offset against this would be the $551,000 cash investment and $1,218,000 remaining to be paid on the notes. We have found that in 1976, the value of equipment in a 40-mile system would be less than $580,000 (see p. 36, supra, and n. 42, supra), the revised construction cost of the entire system. We note that respondent's expert put a lesser value ($488,596) on the equipment actually in the system and petitioners do not dispute this figure (see p. 48, infra). We also note that BHA allocated only $281,573 of the total proceeds to the equipment (the remainder allocated to the franchise), see p. 29, supra,↩ in reporting the "sale" of the system. 50. See Appendix G.↩
51. Compare the rule that the existence of a profit objective under section 183 is determined at the partnership level and in reaching such a determination, the general partners' intent, knowledge, and conduct are critical elements. See Finoli v. Commissioner,86 T.C. 697, 721-722 (1986), citing Fox v. Commissioner,80 T.C. 972 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. Hook v. Commissioner,634 F.2d 5 (3d Cir. 1984), Kratsa v. Commissioner,734 F.2d 6 (3d Cir. 1984), Leffel v. Commissioner,734 F.2d 6 (3d Cir. 1984), Rosenblatt v. Commissioner,734 F.2d 7 (3d Cir. 1984), Zemel v. Commissioner,734 F.2d 9 (3d Cir. 1984); Siegel v. Commissioner,78 T.C. 659 (1982); Brannen v. Commissioner,78 T.C. 471 (1982), affd. 722 F.2d 695↩ (11th Cir. 1984).
52. In fact, the private offering memorandum specifically listed Siegal's lack of prior experience in the CATV industry as a risk factor. See page 9, supra.↩ In connection with the foregoing, we are constrained to note that the private offering memorandum was replete with disclaimers. While we recognize that disclaimers are the order of the day because of the restrictions of securities law, the disclaimers in the private offering memorandum herein are so frequent and so all inclusive as to raise a serious question as to whether they permit any bona fide business foundation for the contemplated transaction.
53. Scheinman subsequently prepared many appraisal reports for BFM related partnerships; this was Scheinman's first affiliation with BFM. ↩
54. See Finoli v. Commissioner,86 T.C. 697, 700 (1986). In Finoli,↩ the taxpayer was a limited partner in a limited partnership that acquired a CATV system from BFM and its affiliates.
55. We note that the partnership would have to retain an ownership in the system for 7 years before it could take full advantage of the ITC.↩
56. Petitioner's counsel questioned Siegal at trial: Q: Mr. Siegal, in your judgment, would it be prudent * * * to invest in Benton Harbor exclusively for the tax benefits? A: Would it be prudent? I think it would be prudent if a person wanted to do that. Q: For just the tax benefits? A: You asked me if it's prudent. I think it would be prudent if that's what they wanted to do. I don't see what is wrong with that. * * * I wish I could do it today, to tell you the truth. ↩
57. At trial, Siegal candidly described how perspectives and players change, as a transaction progresses: It's an interesting thing. When you get your money back from tax benefits, the next day the people want to know how their investment is. It was their shelter when they did it; the next day it's their investment. And now they're wondering where their money was. The tax benefits, they had already.↩
58. See Saviano v. Commissioner,765 F.2d 643, 654 (7th Cir. 1985), affg. 80 T.C. 955 (1983), in which the Court of Appeals for the Seventh Circuit stated: "It is unfortunate that in their haste to obtain tax deductions taxpayers have put their common sense behind them and have become easy targets for tax shelter charlatans." Cf. West v. Commissioner,88 T.C. 152, 161↩ (1987).
59. BFM used these form agreements as the basis for other similar transactions. ↩
60. Siegal testified that the closing took all day and that during the closing he requested several changes. Apparently, the changes involved tax concepts and the escrow rather than any price negotiations. ↩
61. Petitioners apparently concede that the nonrecourse note to BFM should be reduced for basis, depreciation and ITC purposes to $488,596, the value set by respondent's expert.↩
62. See Leger v. Commissioner,T.C. Memo. 1987-146↩. 63. There is considerable doubt as to whether BHA, a cash basis partnership, in fact, paid many such expenses. Although several payments were made, we cannot determine from the record which items they purportedly covered. ↩
64. See n. 63, supra. We recognize that our finding that the transaction lacked economic substance does not preclude petitioners from claiming a deduction under section 163 for interest actually paid on a genuine indebtedness. See Rice's Toyota World, Inc. v. Commissioner,752 F.2d 89, 96 (4th Cir. 1985), revg. in part 81 T.C. 184 (1983); Rose v. Commissioner,supra.We have also concluded, however, that the notes were nonrecourse, that they unreasonably exceeded the value of petitioners' interest in the system and equipment, and that payment was unlikely. Accordingly, we also conclude that the notes did not represent genuine indebtedness, and petitioners would have been denied the interest deduction even if paid. See Fox v. Commissioner,supra.↩
65. Inasmuch as respondent has raised this issue in the amended answer, respondent bears the burden of proof. Section 6214(a); Rule 142(a); Zirker v. Commissioner,87 T.C. 970, 981↩ (1986).
66. We also note that section 1535 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2750, specifically amends section 6621(c)↩, adding to the list of tax motivated transactions "(v) any sham or fraudulent transaction."
*. The management agreement indicates that in addition to the guaranteed base payments, BHA was to receive 10% of any revenues in excess of $250,000. However, the override figures were computed such that BHA received 10% of total revenues whenever revenues exceeded $250,000. See Appendix B. ** It appears that the 1979 System Fee was calculated incorrectly. In 1979, BHA was guaranteed a base payment of $175,000. Assuming that the $401,731 total revenue figure is correct, the override component for 1979 is $40,173 ($401,731 X 10%). Accordingly, it appears that the System Fee should be $215,173 ($175,000 + $40,173). *** It appears that the 1981 System Fee was calculated incorrectly. In 1979 BHA was guaranteed a base payment of $185,000. Assuming that the $496,579 total revenue figure is correct, the override component for 1981 is $49,657 ($496,579 X 10%). Accordingly, it appears that the System Fee should be $234,657 ($185,000 + $49,657). **** These numbers are in error because they do not reflect the above noted changes in the System Fee. The correct net operating income is $16,610 for 1979 and $70,055 for 1981.↩
*. The management agreement indicates that BHA was to receive 10% of any revenues in excess of $250,000. These override figures were computed such that BHA receives 10% of total revenues whenever revenues exceed $250,000. ** Payable by Limited Partners in the form of notes due quarterly commencing January 20, 1977, until fully paid in 1979. [This notation was contained in the private offering memorandum.] *** On Appendix C, interest due in 1979 is stated at $117,719. **** In 1981, total revenues were estimated to be $496,579. Accordingly, the override component would be $49,657 ($496,579 X 10%). See Appendix A. ***** In 1982, due to an error in addition, apparently expenses were understated by $19. Accordingly, net profit was overstated by $19.↩
*. It appears from Appendix A that this number should be $49,657. See explanation on Appendix B.↩
*. Limited Partner Investor receives 1/22 of 98% of Taxable (Loss) Write-offs and Anticipated Cash Flow.↩
*. BFM also represented that the projected ratio of write-off to investment input was: 1976 - 3.45; 1977 - 3.16; 1978 - 3.17; 1979 - 2.35.↩